*Decision will be entered under Rule 50.*

WILLIAM H. PARSONS AND SARA D. PARSONS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 81746. Filed December 31, 1964.

*Sydney A. Gutkin* and *David Beck*, for the petitioners.
*Max J. Hamburger* and *Francis J. Cantrel*, for the respondent.

FORRESTER, *Judge:* Respondent determined deficiencies in income taxes and additions to tax as follows:[1]

| Taxable year | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 293(b) | Sec. 294(d)(1)(B) |
| 1943 | $52,610.42 | $28,013.82 | |
| 1944 | 72,179.31 | 42,077.46 | |
| 1945 | 54,041.32 | 27,020.66 | |
| 1946 | 63,569.78 | 31,784.89 | $118.10 |
| 1947 | 76,660.93 | 41,157.43 | |

These determinations related to timely filed returns for said years, each of which bore the caption "William H. Parsons" and was signed only by William H. Parsons as the taxpayer making such return.

The statutory notice of deficiency setting out and explaining the determinations, which was mailed June 17, 1959, was directed to "Mr. William H. Parsons and Mrs. Sara D. Parsons, Husband and Wife." The only adjustments made therein that are put in issue by the petition in this proceeding were determinations of additional unreported net income in substantial amounts for each of the years in question. The determinations as to the understatements of net income for each year were made pursuant to a statement of the net worth of "William H. and Sara D. Parsons," attached to the notice of deficiency as Exhibit A thereto, which was prepared by respondent as of the last day of each of the years 1942 through 1947, inclusive. Certain other adjustments were made in the deficiency notice, all of which had been found on previous examinations of some of the years before us, and waiver of restrictions on assessment and collection of deficiencies with respect to all of which had previously been made, but these adjustments as they may relate to the decision in this proceeding are not here contested.

The petition herein was captioned in the names of, and verified by, both William H. Parsons and Sara D. Parsons. By their reply it was admitted that William H. Parsons had filed individual tax returns in the years in question, but it was alleged that no joint returns had been filed. Error was asserted with respect to the determination of joint liability because of the alleged absence of joint returns. Upon motion made at trial and leave granted by the Court, respondent hav-

---

[1] All Code references herein are to the Internal Revenue Code of 1939 unless otherwise stated. For 1943, income and Victory taxes are included.

ing indicated his lack of objection thereto, the petition itself was amended to include the above allegations of error and fact.

Respondent's answer to the amendment of the petition denied these allegations and alleged in turn that the returns in the name of William H. Parsons were the returns of both William H. Parsons and Sara D. Parsons. However, in his opening brief respondent admitted that the returns in question were the separate individual returns of William H. Parsons, and that Sara D. Parsons had not intended to treat them as joint returns. Respondent concluded and conceded that Sara D. Parsons is not liable for any deficiencies that may be found herein.

The issues for our decision are:

(1) Whether William H. Parsons (hereinafter usually referred to as Parsons or petitioner) realized additional taxable income which he failed to report on his income tax returns for the years 1943 through 1947 and, if so, the amounts of the resulting deficiencies in tax;

(2) Whether any part of any deficiencies for each of the taxable years 1943 through 1947 was due to fraud with intent to evade tax on the part of petitioner;

(3) Whether petitioner is liable for an addition to tax for the year 1946 under section 294(d)(1)(B);

(4) Whether the assessment and collection from petitioner of any deficiencies or additions to tax for the years 1943 through 1947 are barred by the statute of limitations.

### FINDINGS OF FACTS

Some of the facts have been stipulated and are so found.

Parsons and Sara D. Parsons, husband and wife, resided during the taxable years at Seaford, Sussex County, Del. Parsons filed his timely separate Federal income tax returns for the years 1943 through 1947, inclusive, with the collector of internal revenue at Wilmington, Del.

Parsons was born in 1890 near the farming community of Seaford, Del., in the same general area in which ancestors of his had lived for a number of generations. He was educated at the local high school, which he finished in 1909. After leaving school, Parsons continued to live in the family home built by his father. In 1929 he married Sara Dill (Parsons), who was also from the same area. They did not move from the Parsons family home until after the years in question.

Petitioner's father had been engaged in the lumber business prior to his death in 1909. In 1912 petitioner entered the lumber business which had been started by his father, and he operated the same with his brother Olin. During the early 1930's petitioner and Olin took over ownership of the business following the death of their mother

in 1931. They thereafter operated it as a partnership until Olin's death in 1937.

Petitioner purchased from Olin's estate his deceased brother's share and interest in the partnership at some date prior to February 1, 1939. Since that time, petitioner has conducted the business as a sole proprietor under the name Parsons Bros. & Co. (hereinafter referred to as Parsons Bros.). During the period 1943 through 1947, Parsons Bros. was engaged primarily in the manufacture of wooden containers (boxes and crates).

The only item of taxable income reported on petitioner's 1943 Federal income tax return was net income of $64,318.74 from the business of Parsons Bros. Petitioner claimed a personal exemption of $1,200 as a married man living with his wife.

The only item of income reported on petitioner's 1944 return was also net income from Parsons Bros. This was in the amount of $24,219.32. He claimed surtax exemptions of $500 for himself and $500 for his wife, and a normal tax exemption of $500.

On his 1945 return Parsons reported as taxable income $487.50 from dividends and a $21,826.36 net profit from Parsons Bros. As in the case of 1944, petitioner claimed surtax exemptions of $500 for himself and $500 for his wife, and a normal tax exemption of $500.

On his original 1946 and his 1947 returns, Parsons reported $20,940.32 [2] and $18,553.02, respectively, as net profit from Parsons Bros. For each of these years he reported, as in the case of 1945, dividend income of $487.50. For each he claimed personal exemptions (normal and surtax combined) of $500 for himself and $500 for his wife. The only other items of income reported by petitioner for any of the years in question were income from the rental of "Frame Dwellings" in the amount of $1,590 and a Seaford City councilman's fee in the amount of $48, both reported for 1947. For 1946 he claimed a $200 loss on the sale of an automobile.

Petitioner took $500 standard deductions for 1945 and 1946 and itemized deductions of $574.95, $2,296.99, and $1,101.56 for 1943, 1944, and 1947, respectively. All of the itemized deductions taken in these years were for State taxes paid, with the exception of a $1,000 charitable contribution made in 1947.

Petitioner's income tax return for 1938 was prepared by James W. Burns, an accountant with offices in Wilmington, Del. Burns, who had been recommended to petitioner by a bank in Wilmington, was employed by petitioner to do accounting work for Parsons Bros. and to prepare tax returns for petitioner regularly until Burns' death in November 1946. After his death his accounting practice was acquired

[2] An unsigned document purporting to be an amended return for 1946 was filed by petitioner. The only difference between income reported thereon and on the original was a $5,856.11 increase in the former of commission deductions claimed for Parsons Bros ; consequently a greater amount of taxable income was reported on the original return.

by Bernard B. Isaacson, who was subsequently joined by Benjamin Stolper, both of Wilmington.

Petitioner's income tax returns for 1943, 1944, and 1945 were signed in the place designated for the signature of the person preparing them by V. E. Smith of the firm of James W. Burns & Co. The 1946 return was so signed by B. W. Price of the firm of the same name, and the 1947 return was also signed by B. W. Price, of the firm then known as Burns, Isaacson & Stolper.

The returns so signed bore notations as follows:

1943—"Prepared from books and records."
1944—"Prepared from information submitted."
1945—    "        "        "        "
1946—    "        "        "        "
1947—"Prepared from information furnished."

Petitioner's 1943 and 1944 returns were examined in 1945 by John J. Donnelly, a revenue agent employed by respondent. Agent Donnelly's report of his examination stated his conclusion that there were income tax deficiencies for these years in the amounts of $3,417.22 and $11,975.61, respectively. Petitioner executed a waiver of restrictions on assessment and collection of the deficiencies so found in 1945, and these amounts were paid, with interest, in September 1945.

Such increase in petitioner's 1943 income determined by Agent Donnelly was in part attributable to the disallowance of a $3,000 commission expense item and to unreported dividend income found to be in the amount of $112.50. The determined increase in 1944 income was attributable to the disallowance of a $3,000 commission expense deduction, to an increasing adjustment in the amount of $15,000 to the closing inventory of Parsons Bros. for the year, and to unreported dividend income found to be in the amount of $477.50.

In 1950 petitioner's returns for 1946 through 1949 were examined by Jay M. Bunting, also a revenue agent employed by respondent. Deficiencies for the years 1946 and 1947, waiver of restrictions on assessment and collection of which were likewise executed by petitioner, were found by Agent Bunting to exist in the amounts of $1,585.02 and $8,419.27, respectively. These amounts were paid, with interest, in June 1950.

In the course of such examination, Bunting asked petitioner for the latter's books and records. The only books and records produced by petitioner reflecting income from any source were those of Parsons Bros. The adjustments giving rise to findings of deficiencies for the years 1946 and 1947 included determinations that dividend income had been underreported in the amounts of $1,489.75 and $1,632.50, respectively. Bunting's determinations as to total dividend income were made by his calculating the amounts from the number of shares of stock Parsons told him he owned, using per-share divi-

dends indicated in a book Bunting had in his office as having been paid by the corporations, the stock of which Parsons said he owned.

The adjustments made by Bunting also included the disallowance of $3,000 items claimed as commission expense deductions for both 1946 and 1947. The $3,000 commission expense items claimed and disallowed for the years 1943, 1944, 1946, and 1947 were payments made to petitioner's wife by Parsons Bros. in each year.

In September of 1951, Robert Bayer, a revenue agent employed by respondent for the area including Seaford, Del., was assigned to examine information received by respondent with respect to the sale in 1948 by petitioner of certain timberland. He was told to check Parsons' holdings of property, timberland, etc. Bayer's first contact with petitioner occurred on October 11, 1951, and at that time he was referred by Parsons to the latter's accountants, Benjamin Stolper and Bernard Isaacson. Isaacson denied knowledge of the sale and referred Bayer back to petitioner. Later in 1951 Bayer was referred again by petitioner to Isaacson and back to petitioner by the latter without receiving any information or books and records. On January 7, 1952, Bayer contacted petitioner and was told that no records had been kept of rental properties, investments, and certain other activities. He was asked for time for petitioner to consult his accountants and accumulate the requested information.

Bayer's next contact with anyone representing Parsons was a letter received from Isaacson dated April 10, 1952, suggesting a time for a meeting to discuss petitioner's tax affairs. Meanwhile, by February of 1952, Bayer had requisitioned petitioner's tax returns for 1943 through 1947 and had commenced to examine them in the course of his investigation. A lengthy and through examination into Parsons' affairs ensued, and a so-called 30-day letter was issued in May 1957.

The remaining contacts between Bayer and Isaacson or Stolper in 1952 concentrated on matters concerning the year 1948 and subsequent years. In September 1952, Bayer received from Stolper a statement prepared by Stolper, at Bayer's request, of Parsons' net worth as of the end of the years 1947 through 1950. Bayer's next meeting with Stolper, Isaacson, or Parsons was a meeting with Stolper in August 1953, to discuss the statement prepared by Stolper the previous year.

By the fall of 1953 a special agent, William Gibney, had been assigned to the case by respondent. On November 9, 1953, Bayer and Gibney met with Parsons, Isaacson, and Stolper at the accountants' office. Gibney explained that his duties as a special agent were to investigate any possible criminal violations, and he advised petitioner that the years being reviewed were 1943 through 1951. This was the first time petitioner was informed directly that any years prior to 1948 were under investigation.

At this meeting Parsons stated that his only sources of income were disclosed on the income tax returns filed by him for the years in question.

The investigation continued through the following years. Bayer met with Parsons at least seven times in 1954 to check out certain aspects of Parsons' activities; Gibney usually was present at these meetings. One such meeting occurred on November 18, 1954, at Parsons' office. At that time Gibney informed Parsons that he was entitled to a letter from the Commissioner of Internal Revenue in connection with a reexamination of petitioner's books of account for the years 1943, 1944, 1946, and 1947 which had previously been examined. Parsons stated that he knew there was nothing he could do ultimately to prevent such a reexamination, and that he saw no need to request such a letter.

In 1955 Gibney was replaced by Special Agent Harold Maloney. Occasional meetings with petitioner in the course of the agents' investigation continued through 1955 and 1956.

Sometime early in 1957 it was decided that the criminal phase of the investigation would be dropped. On February 15, 1957, Bayer and Maloney met with Isaacson and Stolper and apprised them of the fact that the case was then open only for the determination of any civil liability. The agents were then presented with a written power of attorney that had been executed by Parsons and Sara D. Parsons on February 11, 1957. This power stated that Isaacson and Stolper had full authority to represent Parsons before the Treasury Department in connection with any matter involving Federal taxes for any and all years.

Bayer had decided, because his investigation disclosed that Parsons had a number of sources of unreported gross income and that the records kept by Parsons were in numerous instances either inadequate or nonexistent, that the net worth method would be used to determine petitioner's income. At the February 15, 1957, meeting Bayer presented to Isaacson and Stolper a statement, drawn up by Bayer as the result of his investigation, of the assets and liabilities of William H. and Sara D. Parsons as of the end of each year from 1942 through 1947. This net worth statement was the focal point of a number of discussions Bayer had thereafter with Isaacson, Stolper, and one of their employees, Frank Holton. But these discussions left most matters unresolved, and the deficiency notice giving rise to these proceedings, which was based on the statement presented by Bayer in 1957, was subsequently issued.

Petitioner kept what appeared generally to be adequate books and records with respect to the operation of Parsons Bros., except that there was a certain laxity with respect to inventory records. When

asked about his inventory records by Bayer, Parsons admitted that he had no detailed physical inventory records and was vague as to his inventory procedures.

For purposes of computing the cost of goods sold by Parsons Bros., petitioner's returns for the years in question reflected the following:

| | Inventory at beginning of year | Merchandise bought for sale | Inventory at end of year |
|---|---|---|---|
| 1943 | $40,162.18 | $288,577.29 | $10,364.09 |
| 1944 | 10,364.09 | 483,406.07 | 10,165.40 |
| 1945 | 1 25,164.40 | 497,892.27 | 30,750.00 |
| 1946 | 30,750.00 | 277,152.68 | 27,400.00 |
| 1947 | 27,400.00 | 263,239.51 | 148,500.00 |

1 This figure reflects the adjustment made in the 1945 examination by Agent Donnelly to the closing inventory for 1944.

In the general ledger of Parsons Bros. was a page entitled "Timber." There were no entries on this page, which would normally indicate an absence of transactions involving timber. However, in the years in question petitioner made a number of purchases of timberland containing uncut timber.

Certain of these purchases were not capitalized, but were expensed in the year of purchase by being included in merchandise bought for sale in such year and, even though still uncut at the end of the year, excluded from the determination of closing inventory. Purchases of standing timber which were so handled in the inventory accounts and which remained on hand and uncut at the end of 1947 were in the following amounts:

1943—$26,000.00
1944— 35,090.00
1945— 42,000.00
1946— 24,458.30
1947— 11,000.00

The adjustment made to closing inventory of 1944 by Agent Donnelly, in his 1945 investigation, did not include any amount with respect to the exclusion from closing inventory for either 1943 or 1944 of such amounts of timber purchased and expensed during said years and still on hand, uncut, at the end of said years.

In addition to the aforesaid improper expensing of timberland petitioner occasionally took materials from the Parsons Bros. lumber inventory, which had been expensed as cost of goods sold, for personal use in the construction of rental properties. The inventory cost of materials so used in 1946 and 1947, respectively, was $1,905.83 and $665.12.

Petitioner and Sara D. Parsons were coowners of certain corporate stock in years in question and together received dividends therefrom as follows:

| | 1943 | 1944 | 1945 | 1946 | 1947 |
|---|---|---|---|---|---|
| First National Bank of Seaford | $82. 50 | $112. 50 | $112. 50 | $112. 50 | $112. 50 |
| Seaford Trust Co.[1] | 97. 50 | 415. 00 | 350. 00 | 400. 00 | 400. 00 |
| American Telephone & Telegraph Corp | | | 900. 00 | 900. 00 | 900. 00 |
| General *Motors* Corp | | | 300. 00 | 302. 25 | 227. 25 | 303. 00 |
| Wilmington Trust Co | | | | 300. 00 | 450. 00 | 500. 00 |
| Peoples National Bank | | | | | | 90. 00 |
| Seaford Building and Loan Association | | | 1, 066. 25 | | |
| | 180. 00 | 1, 727. 50 | 3, 031. 00 | 2, 089. 75 | 2, 305. 50 |

[1] About 95 percent of their stock in this company was held by petitioner and Sara jointly until April 1947 when the shares held by petitioner individually were transferred to their joint names. Since we do not have dividend dates, accurate allocations of income cannot be made, but this is *de minimis*.

In each of the years before us except 1946 petitioner and Sara D. Parsons acquired additional corporate stock. Parsons and Sara D. Parsons were sent a copy of a Form 1099 Information Return for the year 1943 with respect to dividends paid by the First National Bank of Seaford. This form contained instructions indicating that in petitioner's case dividend income received from said bank should be reported for 1943.

Petitioner reported no income from poultry ventures in the years in question. Yet, during these years petitioner maintained a special bank account (hereinafter referred to as the poultry account) in the First National Bank of Seaford used exclusively for the deposit of receipts from poultry operations and the deposit of loans made by said bank to Parsons, and for the payment of expenses incurred in poultry operations. The gross deposits into the poultry account in the years in question, exclusive of such loan proceeds, were as follows:

```
1943_____ $23, 598. 58
1944_____ 140, 071. 03
1945_____ 158, 872. 46
1946_____ 146, 226. 57
1947_____ 140, 398. 84

     Total_____ 609, 167. 48
```

Petitioner withheld from respondent's agents any information as to the existence of the poultry account, although he had been asked to identify his bank accounts on a number of occasions, and had identified many other accounts. When the agents informed Parsons in October 1954 that they had learned of the poultry account, Parsons appeared restless and disturbed. He said that his poultry records were being checked by his accountants, but that he would make them available to the agents when Isaacson and Stolper were through with them.

Bayer's examination was aided by the poultry records subsequently made available by Parsons, particularly with respect to identifying the sources of deposits to the poultry account, but he was unable to determine net income from poultry operations to his satisfaction. This was because the principal element of petitioner's poultry book-

keeping was a ledger organized on the basis of individual flocks, and whereas this ledger contained debit entries showing expenses incurred in connection with the flocks, in many instances the offsetting income credits were never entered in the ledger.

The poultry operations in which petitioner was involved took the form of contracts between Parsons and a number of poultry growers whereby Parsons agreed to furnish the chicks, feed, and medication in return for 25 percent of the net profits from the sale of the poultry. In many instances Parsons was to suffer all losses alone.

In most instances Parsons received the gross proceeds of poultry sales himself, from which he would obtain reimbursement of his expenses and his share of the profit directly. But at least one grower, Lawrence J. Manogue, sold the poultry himself and then reimbursed Parsons for expenses and paid the latter his share of the profit.

On the dates shown below, Manogue paid Parsons the latter's 25 percent of the net profit on certain flocks, the expenses of which flocks were reimbursed to Parsons on the same dates, as follows:

|  | Parsons' 25 percent of net profit | Expenses reimbursed |
|---|---|---|
| July 23, 1946 | $679.76 | $7,555.29 |
| Dec. 9, 1946 | 38.49 | 8,632.74 |
| Aug. 4, 1947 | 297.71 | 9,120.15 |
| Dec. 5, 1947 | 344.25 | 9,811.62 |
| Total | 1,360.21 | 35,119.80 |

The profit payments from Lawrence J. Manogue were not deposited in the poultry account, but all the Manogue expense payments were so deposited.

Sara D. Parsons was not in the poultry business with petitioner and did not share in any of the profits therefrom.

In connection with the financing of a chickenhouse built on Lawrence J. Manogue's property, Manogue signed a note to Parsons in the amount of $3,000 in 1945. On October 15, 1947, Manogue made an interest payment to petitioner in the amount of $211.45.

Rental properties were built from 1938 through 1949 on land held in the name of both petitioner and Sara D. Parsons as follows:

|  | Number of units constructed | Cost of year's construction | Cumulative total of investment |
|---|---|---|---|
| 1938 | 6 | $11,975 | $11,975 |
| 1940 | 1 | 500 | 12,475 |
| 1943 | 4 | 25,500 | 37,975 |
| 1944 | 1 | 5,000 | 42,975 |
| 1945 | 2 | 15,500 | 58,475 |
| 1946 | 4 | 21,900 | 80,375 |
| 1947 | 8 | 34,000 | 114,375 |
| 1948 | 5 | 26,000 | 140,375 |
| 1949 | 1 | 5,000 | 145,375 |
| Total | 32 | 145,375 | 145,375 |

Parsons kept no records of his income from these rental properties in the years in question. His rental receipts were not deposited in a bank account, but were used to build additional rental properties.

Petitioner reported no rental income for 1943 through 1946, but reported rental income of $1,590 for 1947. In 1948, 1949, and 1950 petitioner and Sara D. Parsons received $9,784, $15,459, and $16,385, respectively, as rent from these properties.

Petitioner and Sara D. Parsons were the owners of substantial farm acreage in their joint names. Their farming ventures took the form of contracts with tenant farmers, who operated the farms on a share-crop basis. There were at least six men farming a total of approximately 450 acres on such a basis, with the Parsonses usually furnishing the land, feed, seed, and fertilizer in exchange for one-half of the crop raised. The crops normally consisted of some type of grain.

Petitioner kept no records of farming income, and he reported no income from farming operations in the years in question. He twice denied to respondent's agents that he had farm income prior to 1951, or that the farms were operated prior to that year. When told by the agents that they were aware of items of farm income prior thereto, he insisted that he made no money therefrom.

In November and December 1947, Huston, Culver & Co., Inc., drew checks totaling $3,095.19 to Parsons in payment for produce from the aforesaid tenant farms. During the years in question Parsons paid cutters of timber for Parsons Bros. in farm produce in lieu of cash, as follows:

| 1943 | 1944 | 1945 | 1946 | 1947 |
|------|------|------|------|------|
| $494.73 | $1,045.84 | $69 | $60 | $94.59 |

Sometime prior to 1946 certain land owned by petitioner and Sara D. Parsons was plotted into 46 lots, forming a development known as Parsons Village. Certain improvements were made to the development such as putting in streets, curbs, and sidewalks.

In 1946 one unimproved Parsons Village lot was sold for $700 and one improved lot was sold for $5,500. In 1947 two unimproved Parsons Village lots were sold for $700 each. Payments were made in the years of sale.

The original cost of the Parsons Village land was $15,750. Total expenses paid in connection with the development through 1946, including the land cost, was $17,594. Such expenses through 1947 totaled $27,993.85. Through the end of 1952 a total of only 15 of the Parsons Village lots had been sold.

The sales, management, and accounting relating to Parsons Village were handled by a firm of realtors in Seaford. They kept complete records of sales and expenses, and occasionally sent petitioner statements as to the same. Petitioner stated that he thought no income

from this development had to be reported until total expenses had been recouped, but he never checked this with his accountants.

In the years in question petitioner had unreported long-term gains from the sale of realty capital assets coowned by him with Sara D. Parsons, as follows:

| Year | Property | Basis | Sale price | Expenses | Gain | Petitioner's portion of gain | Reportable 50 percent of petitioner's gain |
|------|----------|-------|-----------|----------|------|------------------------------|---------------------------------------------|
| 1945 | Improved lots in Seaford | $1,000.00 | $2,500 | $2.75 | $1,497.25 | $748.62 | $374.31 |
| 1946 | Improved lots in Laurel, Del | 1,000.00 | 3,000 | 6.05 | 1,993.95 | 996.98 | 498.49 |
| 1946 | 55 acres, Little Creek hundred | 550.00 | 4,000 | 4.40 | 3,445.60 | 1,722.80 | 861.40 |
| 1946 | 114⅚ acres improved | 1,146.25 | 4,000 | 4.40 | 2,849.35 | 1,424.68 | 712.34 |

In 1947 petitioner had an unreported long-term capital gain from the sale of a chickenhouse in the total amount of $4,334.24. The house cost $8,191.44 and was sold for $10,000. The reduction in basis for allowable depreciation to the time of sale was $2,525.68.

In 1947 petitioner received $8,500 for the sale to Nuttle Lumber & Coal Co. of rights to cut timber on land petitioner had a short time earlier bought for $8,500. Though he retained the land itself, petitioner reported no gain from this transaction.

For many years prior to 1942, and continuing through the years here in question, petitioner was a member of the Seaford, Del., City Council. In such capacity he received a fee of $48 in each of the years before us. He reported this income only for the year 1947. In each of such years he incurred nonreimbursed expenses in connection with his duties as a city councilman which were at least as great as the $48 fee received by him.

In 1945 petitioner became a director of the Seaford Trust Co. In this capacity he appeared alert, knowledgeable, and intelligent. Petitioner received a director's fee in the amount of $2 per meeting attended during the years 1945, 1946, and 1947, and in these years received from this source $88, $102, and $104, respectively, none of which was reported by him on his Federal income tax returns. In each of these years he incurred nonreimbursed expenses in connection with his duties as a bank director in amounts at least as great as his income from this source.

All of petitioner's business or income-producing activities were of a "legitimate" nature. He has never been indicted or convicted of a crime, and in addition to the bank directorship and city council membership mentioned above, petitioner has served on the Delaware State Legislature and has been a member of the Delaware State Industrial Development Committee, the board of trustees of Nanticoke Memorial Hospital, and the board of directors of the Seaford Building & Loan Association.

In each of the years in question Parsons Bros. took deductions in the amount of $3,000 for payments made to Sara D. Parsons, the deductibility of which was disallowed by Agents Donnelly and Bunting in their examinations conducted in 1945 and 1950, respectively. Sara D. Parsons performed no services for Parsons Bros. in these years, and these payments were intended by petitioner to be gifts to his wife. Said payments were included in the commission expenses of Parsons Bros. only by reason of an error of the bookkeeper of that proprietorship.

The only depreciation deductions claimed by petitioner on his Federal income tax returns for the years in question were for depreciation of assets owned by Parsons Bros.

The income tax returns here in question were prepared by petitioner's accountants from the information submitted to them by him. The fact that the returns prepared by them understated petitioner's net income resulted either from the lack or inadequacy of books and records kept by petitioner, or from his failure to present certain books and records to them, and not from wrongdoing on the part of the accountants.

Respondent's determination as to the amount of the understatements of net income on the returns here in question was made from his determination as to the increase in the joint net worth of William H. and Sara D. Parsons in each of the years in issue. His determination as to the increase in the joint net worth of petitioner and Sara D. Parsons in each of the years was made from a statement of their joint net worth prepared on the cost basis by Bayer as of the end of each of the years 1942 through 1947, inclusive. This net worth statement is summarized, showing the totals in each of the categories into which respondent broke down the toal assets and liabilities, as follows:

| | December 31— | | | | | |
|---|---|---|---|---|---|---|
| | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 |
| **Assets, business:** | | | | | | |
| Cash (bank or on hand) | $25,045.64 | $67,849.92 | $17,506.86 | $15,540.67 | $9,111.21 | $4,961.69 |
| Accounts receivable | 47,060.65 | 24,873.16 | 59,257.14 | 28,106.05 | 35,559.52 | 36,202.16 |
| Notes receivable | 963.75 | 963.75 | 963.75 | 0 | 0 | 0 |
| Inventory | 40,162.18 | 10,364.09 | 25,165.40 | 30,750.00 | 27,400.00 | 148,500.00 |
| Real estate—business | 9,858.20 | 10,858.20 | 10,858.20 | 10,858.20 | 10,858.20 | 10,858.20 |
| Machinery and other equipment | 57,340.63 | 60,518.49 | 65,134.53 | 69,533.24 | 75,690.10 | 79,338.72 |
| Other business assets | 4,030.07 | 4,030.07 | 4,030.07 | 4,030.07 | 4,030.07 | 8,390.41 |
| Total—assets, business | 184,461.12 | 179,457.68 | 182,915.95 | 158,818.23 | 162,649.10 | 288,251.18 |
| **Assets, nonbusiness:** | | | | | | |
| Cash (bank or on hand) | 882.11 | 5,219.27 | 22,127.94 | 13,469.44 | 16,930.19 | 15,831.74 |
| Receivables—on open account | 0 | 0 | 12,330.89 | 7,363.61 | 21,519.38 | 20,340.31 |
| Real estate (business and investment) (Sussex County, Del.) | 24,814.37 | 75,014.37 | 146,490.56 | 238,640.56 | 269,522.95 | 353,879.58 |
| Real estate (business and investment) (Wicomico County, Md.) | 11,157.87 | 18,157.87 | 18,157.87 | 18,157.87 | 35,990.07 | 35,990.07 |
| Real estate (business and investment) (Dorchester County, Md.) | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 19,500.00 | 19,500.00 |

| | December 31— | | | | | |
|---|---|---|---|---|---|---|
| | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 |
| **Assets, nonbusiness—Con.** | | | | | | |
| Machinery and other equipment | 0 | 0 | 0 | 0 | $3,176.23 | $3,176.23 |
| Prepaid insurance | 0 | 0 | 0 | 0 | 400.46 | 200.23 |
| Other nonbusiness assets | 0 | $15,000.00 | 0 | 0 | 0 | 0 |
| Total—assets, nonbusiness | $38,354.35 | 114,891.51 | $200,607.26 | $279,131.48 | 367,039.28 | 448,918.16 |
| **Assets, personal:** | | | | | | |
| Cash (bank or on hand) | 6,429.62 | 6,365.79 | 5,525.12 | 7,164.94 | 7,180.96 | 6,080.42 |
| Loans to relatives and others | 0 | 850.00 | 850.00 | 3,850.00 | 4,794.44 | 4,461.11 |
| Stocks and bonds | 4,575.00 | 40,350.00 | 44,150.00 | 60,989.00 | 54,069.00 | 60,789.00 |
| U.S. Treasury bonds—Series E | 300.00 | 1,800.00 | 5,568.75 | 8,062.50 | 8,812.50 | 8,812.50 |
| Mortgages receivable | 0 | 0 | 0 | 0 | 5,500.00 | 5,500.00 |
| Personal automobiles | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 2,429.00 |
| Total—assets, personal | 12,504.62 | 50,565.79 | 57,293.87 | 81,266.44 | 81,556.90 | 88,072.03 |
| **Liabilities, business, nonbusiness, and personal:** | | | | | | |
| Accounts payable | 8,188.55 | 60,836.35 | 76,150.44 | 44,321.75 | 21,166.43 | 26,618.11 |
| Notes payable | 88,810.00 | 26,500.00 | 24,500.00 | 74,500.00 | 88,500.00 | 170,800.00 |
| Accrued taxes | 0 | (1,097.31) | 0 | 0 | 0 | 1,925.25 |
| Subtotal—liabilities | 96,998.55 | 86,239.04 | 100,650.44 | 118,821.75 | 109,666.43 | 199,343.36 |
| Reserve for depreciation | 21,370.90 | 28,957.00 | 36,839.38 | 47,583.07 | 55,075.14 | 64,008.48 |
| Total—liabilities | 118,369.45 | 115,196.04 | 137,489.82 | 166,404.82 | 164,741.57 | 263,351.84 |

Understatements of net income were computed from this statement by respondent as follows:

| | December 31— | | | | | |
|---|---|---|---|---|---|---|
| | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 |
| Total assets | $235,320.09 | $344,914.98 | $440,817.08 | $519,216.15 | $611,245.28 | $825,241.37 |
| Less: total liabilities [1] | 118,369.45 | 117,390.66 | 137,489.82 | 166,404.82 | 164,741.57 | 263,351.84 |
| Net worth | 116,950.64 | 227,524.32 | 303,327.26 | 352,811.33 | 446,503.71 | 561,889.53 |
| Less: net worth end of preceding year | | 116,950.64 | 227,524.32 | 303,327.26 | 352,811.33 | 446,503.71 |
| Increase in net worth | | 110,573.68 | 75,802.94 | 49,484.07 | 93,692.38 | 115,385.82 |
| Plus: personal expenses and other nondeductible disbursements | | 18,115.05 | 51,683.27 | 44,474.83 | 22,415.01 | 19,114.26 |
| | | 128,688.73 | 127,486.21 | 93,958.90 | 116,107.39 | 134,500.08 |
| Less: nontaxable increases in net worth | | 0 | 0 | 881.78 | 5,263.96 | 2,167.12 |
| Adjusted gross income | | 128,688.73 | 127,486.21 | 93,077.12 | 110,843.43 | 132,332.96 |
| Less: standard or itemized deductions | | 574.95 | 2,296.99 | 548.30 | 605.00 | 1,421.56 |
| Corrected net income | | 128,113.78 | 125,189.22 | 92,528.82 | 110,238.43 | 130,911.40 |
| Less: net income per return | | 63,743.79 | 21,922.33 | 21,813.86 | 20,727.82 | 19,576.96 |
| Understatement of net income | | 64,369.99 | 103,266.89 | 70,714.96 | 89,510.61 | 111,334.44 |

[1] On his recapitulation computation respondent apparently erred in petitioner's favor by increasing liabilities as of the end of 1943 by the amount of $1,097.31 for accrued taxes, whereas on his net worth statement this amount was indicated as a negative figure.

The asset acquisitions regularly contributing most substantially to the increases in net worth determined by respondent, and consequently to his determination of understatements of net income, were those of

real estate put by respondent in the category he entitled "Assets, nonbusiness." These determined assets included separate parcels of real estate numbering from approximately 28 as of the beginning of 1943 to approximately 95 at the end of 1947. Over 20 of these exceeded 100 acres in size. All but a few of the parcels were in the name of both petitioner and Sara D. Parsons.

Sara D. Parsons was a housewife and concerned herself very little with matters involving her and her husband's financial affairs or property. When they were married she had some money and real property, and after the marriage petitioner made gifts of money to her. She turned over all of her property to petitioner to invest, without any restriction as to the type of investments he should make.

Sara D. Parsons filed no Federal income tax returns from 1925 through the years in question. She did, however, have gross income in each of the years before us in amounts which are undetermined. The amount of her adjusted gross income for each of the years 1944 and 1945 exceeded $500.

Sara D. Parsons was not a partner in Parsons Bros. Her understanding was that any property used in the Parsons Bros. business that was in the name of both petitioner and herself was held in such form of ownership only as a type of testamentary arrangement. She was aware, however, of the great amount of other property being acquired in the years in question in the name of herself and petitioner, and she knew that she was the recipient of income in these years from such property.

Neither petitioner nor Sara D. Parsons filed any donor or donee Federal gift tax returns in the years in question. Petitioner received no inheritances or income from trust funds in these years, and he did not feel that he had received any gifts during these years.

Parsons filed false and fraudulent Federal income tax returns with intent to evade tax, and understated his net income on such returns for each of the years 1943 through 1947, inclusive, and a part of the resulting deficiency in such tax for each of these years was due to fraud with intent to evade tax on his part.

### OPINION

Respondent has conceded that the returns giving rise to this proceeding, which were filed by petitioner in his name alone in each of the years in question, were his separate Federal income tax returns for those years, and that Sara D. Parsons had no intention of treating them as joint income tax returns. Respondent's candor, the more difficult because of its effect in complicating an already complex case, is refreshing and highly commendable.

The matter of Sara D. Parsons' lack of intent that the returns before us be joint returns is a question of fact. Although, as will be

seen, we do not agree with all of respondent's arguments as to the legal consequences of this fact in this case, we do agree with his consequent conclusion that the returns cannot be treated as joint returns; that they were the separate individual returns of petitioner, and that Sara D. Parsons cannot be held liable for any deficiencies in tax or additions to tax in this proceeding. *Alma Helfrich*, 25 T.C. 404 (1955), acq. 1956–1 C.B. 4; *Myrtle O. Calhoun*, 23 T.C. 4 (1954), acq. 1954–2 C.B. 3; *Eva M. Manton*, 11 T.C. 831 (1948), acq. 1949–1 C.B. 3. This is not a case in which respondent determined a joint deficiency and joint and several liability where neither spouse had filed a return. Cf. *Joseph Calafato*, 42 B.T.A. 881 (1940), affirmed per curiam 124 F. 2d 187 (C.A. 3, 1941).

We do not consider it necessary in this proceeding to decide the question, which is not raised by the parties, of whether the case accordingly must be dismissed as to Sara D. Parsons;[3] the crucial point is that we do have jurisdiction over petitioner in this proceeding to determine the deficiency in and additions to his tax flowing from the returns in question, even though respondent's determination of deficiency was made on the theory of joint returns and joint and several liability. *Romm v. Commissioner*, 245 F. 2d 730 (C.A. 4, 1957), affirming and remanding a Memorandum Opinion of this Court, certiorari denied 358 U.S. 833 (1958). But of course in our determination we shall be concerned only with the amount of any understatement of *petitioner's* income alone on the returns filed by him, and with the extent to which any *such* understatement may indicate that the returns were fraudulent with intent to evade tax.

It is hornbook law that the questions whether Federal income tax returns filed were false or fraudulent with intent to evade tax and whether any part of any deficiency is due to fraud with intent to evade tax, are questions of fact to be determined from the whole record. Secs. 276(a) and 293(b). We have determined both of these questions in the affirmative for each of the years 1943 through 1947, inclusive, and viewing the record in this case as a whole, we have no question whatsoever that respondent has amply met his burden of proving these matters by clear and convincing evidence.

Our finding is based on a number of factors, only some of which we shall briefly review in this opinion.

---

[3] We are not aware of any of our cases where this point has been considered. In our prior cases we have always thought it to be sufficient, as it is for purposes of the decision in the case before us, to hold that the party who had not joined in the filing of the return in question, but against whom a determination of joint and several liability had been made by respondent, was not liable for any part of any deficiency or addition to tax found therein. See, e.g., *Alma Helfrich*, 25 T.C. 404 (1955), acq. 1956–1 C.B. 4; *Myrtle O. Calhoun*, 23 T.C. 4 (1954), acq. 1954–2 C.B. 3; *Eva M. Manton*, 11 T.C. 831 (1948), acq. 1949–1 C.B. 3.

The first matter we would point out is petitioner's handling of his dividend income. For 1943 and 1944 he reported no dividend income, though as early as 1943 he received a form from one of the paying corporations indicating that he must report such income. For 1945, 1946, and 1947 he reported some dividend income, but the amount reported was exactly $10 more than the portion of his dividend income for 1944 that Agent Donnelly was able to find in 1945. This figure was substantially less than his dividend income for 1944, let alone for 1945, 1946, and 1947. Petitioner gave no reason whatsoever for failing to report any dividend income for 1943 and 1944 or for understating it for 1945, 1946, and 1947.

Petitioner was known by his associates to be knowledgeable and intelligent, and he was active in a number of official and semiofficial capacities which would have made him aware of the requirement that he report all of his income. Even if we might otherwise tend to excuse the understatements of dividend income for the last 3 years on the grounds of negligence or carelessness, we cannot believe these were the reasons for the understatements in these years where, in each of the years except 1946, his stock*holdings* were increasing but the amount reported remained the same. We think the matter of his failure to report for the first 2 years and his substantial understatements of dividend income for the last 3 years alone would support a finding of fraud as to all the years before us. *Blatchford* v. *Commissioner*, 337 F. 2d 1010 (C.A. 3, 1964), affirming per curiam a Memorandum Opinion of this Court. This is all the more true where the amount reported for the years of understatement was merely a token amount more than the amount of dividend income one of respondent's agents had been able to discover in 1945 for 1944, especially where that amount was in turn substantially less than the actual amount of his dividend income for 1944.

Another significant matter is that of the poultry business, for which petitioner reported no income in any of the years in question. Petitioner attempts to excuse this omission with his testimony that he considered his poultry contracts to be merely accommodations for a few friends rather than an endeavor to produce income for himself, and that he did not think that his poultry activities were producing net profits for him. We simply cannot believe either of these contentions. The first is belied by the scope of the operations, as evidenced by the size of the bank deposits. In addition, a boyhood acquaintance of petitioner, who was associated with him at the First National Bank of Seaford, testified that he knew petitioner to have been in the poultry business. As for the profitability of the venture, we cannot believe that a man of petitioner's ability and business experience would have invested as much money for such a long period of time in poultry flocks

as the bank deposits indicate were invested therein if he thought he was just breaking even or losing money thereby. Manogue, the only coventurer to testify, stated that profits were made in his operation with petitioner. Clearly petitioner had net earnings from these operations in the years in question, and he would not have been nor have stayed in the poultry business if this had not been at least one of his purposes.

Petitioner's failure to disclose the existence of the poultry account to respondent's agents when asked, even though other accounts were disclosed, is also an indication of fraud in this case. *Goe* v. *Commissioner*, 198 F. 2d 851 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 897; *Charles F. Bennett*, 30 T.C. 114 (1958), acq. 1958-2 C.B. 3.

Similarly, we think the manner in which petitioner kept his books and records, and in some instances kept none at all, tends to indicate fraud here. In his poultry books expense items were recorded regularly, but frequently the offsetting income received with respect to given flocks was not recorded at all. The page in the Parsons Bros. general ledger which should have shown purchases of timberland was blank, even though there were substantial purchases of timberland in each of the years in question, which indeed were expensed in the respective years of purchase. The fact that petitioner kept no records of his farming, or rental income, is another indication of fraud in this case. *Woodham* v. *Commissioner*, 256 F. 2d 201 (C.A. 5, 1958), affirming a Memorandum Opinion of this Court.

Petitioner would have us conclude that any substantial understatements of income were due to the fault of his accountants, who were hired to prepare his returns. But the whole record speaks of a man of ability and business knowledge who carefully hid, even from his own accountants, the existence of a number of sources of income to him over too long a period of time for us to believe it was anything but a deliberate attempt to defeat tax. On the basis of a great number of facts of record, including but by no means limited to those matters we have set out herein, we think there can be no question that petitioner knowingly understated his net income on his Federal income tax returns for each of the years 1943, 1944, 1945, 1946, and 1947, that such returns were therefore false and fraudulent, and that the resulting deficiencies in each of said years resulted at least in part from fraud by petitioner with intent to evade tax,[4] and we have so found. *Woodham* v. *Commissioner, supra*.

---

[4] We have not explicitly set out herein our analysis of the many specific indications of fraud as they might apply to each year individually, but we have considered this matter on a year-by-year basis in addition to an overall basis, and we are convinced that there was fraud on petitioner's part with respect to each of the years before us.

Respondent, on whose shoulders rested the burden of proving fraud, endeavored to show fraud by the now-familiar net worth method, as well as by proving specific items that raised inferences of fraud. The substance, character, and impact of so many of the proved specific items here are such that we have found it unnecessary to resort to or consider respondent's urged net worth increases. Our finding of fraud has been based solely on proof as to specific items.

Turning now to the task of computing the amount of Parsons' deficiency for each of the years in issue, respondent contends that petitioner has the burden of proof, that he has made no effort to meet such burden, and that we must consequently find the deficiencies to be as determined.

But respondent's determination as to deficiencies is based on the net worth statement showing the net worth increases of Sara D. Parsons and petitioner jointly, and there was no proffered proof as to how much of the net worth increases were attributable to the income of either person individually. Equally as important, we have been able to find substantial amounts of income, unreported by petitioner in each of the years in issue in this case, and we cannot conclude from this record that his allocable share of the alleged joint net worth increases would be any greater in amount. In the posture of this case, we regard the joint net worth statement as unreliable and our further discussions of it are to be read in this light.

Respondent asks us to place reliance on certain matters that he contends indicate that Sara D. Parsons had no income, and that all of the income which may be revealed by proven increases in net worth consequently was petitioner's. But we have found that Sara D. Parsons did have income, and in amounts that cannot be fixed from the record before us, in each of the years in question; and we cannot accept respondent's contentions on this score.

Respondent argues, for instance, that the exemptions claimed by petitioner for the years in question indicate that Sara D. Parsons had no income for these years. While it is true that the claimed exemptions are not inconsistent with her having no income, the only years for which we might take them as any evidence that she had *no* income are 1946 and 1947.[5] Overriding this as evidence, however, is the fact that we have already found that the returns were fraudulent, and where the other evidence indicates she did have income, we think it

[5] In these years petitioner claimed an exemption of $1,000, to the full amount of which he would only be entitled, filing an individual return, if Sara D. Parsons had no gross income. For 1943 petitioner and his wife were entitled to agree to let petitioner take the full amount of the $1,200 exemption. For 1944 and 1945 petitioner would be entitled to the $500 normal tax credit claimed only if his wife had no adjusted gross income, but in respondent's determination of deficiency a $1,000 normal tax credit was allowed, which would only be consistent with a determination that she had adjusted gross income of at least $500. See sec. 25(b) and, for 1944 and 1945, sec. 25(a), as they were amended to apply to the respective years.

would be grossly unfair here to conclude, on the basis merely of exemptions claimed on clearly fraudulent returns, that she had none. We are aware that we have relied in part on such claims in finding that a wife had no income in certain other cases, see, e.g., *Robert Leslie Bowlin*, 31 T.C. 188 (1958), affirmed per curiam 273 F. 2d 610 (C.A. 6, 1960), and *Richard F. Smith*, 31 T.C. 1 (1958), acq. 1959-1 C.B. 5, but in those cases the fact of the taxpayer's claims was used by way of confirming the other evidence of record that the wife had no income rather than as creating any sort of presumption that could overcome the facts as otherwise clearly supported by the record. Here it is clear that Sara D. Parsons had income in each of the years in question. The other contentions made by respondent on this point are less persuasive even than the one of which we have just disposed.

Neither can we separate the major portion of those assets on respondent's net worth statement which were petitioner's from those of his wife in order to reach any reliable conclusion as to what portions of the net worth increases were his alone during the years in question. From Sara D. Parsons' understanding that any of the Parsons Bros. assets that were in the name of herself and her husband were so held as a form of testamentary arrangement, it seems likely that all Parsons Bros. assets were the product only of petitioner's income. It is apparent that a number of such assets, consisting at least in part of parcels of timberland, were included in respondent's most important category of "Nonbusiness" assets, but there is nothing in the record to identify in most instances which of the assets in this category were connected with Parsons Bros. and which were connected with the many income-producing activities in which both petitioner and his wife were involved. As we have found, almost all of the assets respondent placed in this category were in the name of both petitioner and Sara D. Parsons.

Furthermore, we think it would be most dangerous to make assumptions in this case as to whose income increases would be indicated by increases in the net assets of either petitioner or his wife in these years, even if we thought we could successfully separate the assets of each into individual net worth statements. It is clear that much property was acquired, but the major portion of such property was put in the names of both petitioner and his wife, and because of the relationship between the parties we do not think there was any necessary correlation between the form in which title was taken and the relative contributions of income made by the parties to acquire these assets. This cannot be determined from the record before us.

If it were possible from the record to determine the separate net income of Sara D. Parsons for the years in question, we could then subtract such amounts from whatever increases in joint net worth

respondent may have proved in order to find the amount of petitioner's net income for these years. But the record offers no proof as to the amount of her net income for any year. For instance, the farm income was probably one-half hers because from land owned by both of them, but there is no way we can even guess at the amount of income from farming.

We have examined the lengthy record in this case with great care, and we can only conclude that to add to the pitfalls inherent in the net worth method, as pointed out in *Holland* v. *United States*, 348 U.S. 121 (1954), the very questionable assumptions we would have to make to find the understatements of petitioner's income from respondent's net worth proof would be too apt to do serious injustice. We have consequently based our finding of fraud on specific items alone, and have not undertaken to find all the facts that would be needed to resolve all of the numerous disputes between the parties as to proof of the various items that may erroneously have been either omitted from or included in respondent's joint net worth statement.

Respondent has cited three cases as approving the inclusion of properties held in the joint names of husband and wife in a net worth determination against either spouse, and he argues that these cases would support our upholding the deficiency determination which gave rise to this proceeding as against petitioner alone. We cannot agree with his conclusion as to the significance of these cases, however.

*O'Connor* v. *United States*, 203 F. 2d 301 (C.A. 4, 1953), was an appeal from a conviction for criminal tax fraud which had beeen obtained by use of the net worth method. The defendant contended a verdict should have been directed for him because substantial amounts of the assets included in the net worth statement established at trial by the Government were held jointly by himself and his wife. But the Court of Appeals found that the evidence contained a number of indications that all of those assets had been acquired solely with the husband's income, and it held that the case was properly sent to the jury for its consideration of the factual question presented. In the case before us, however, we cannot conclude that all of the assets in the name of both petitioner and Sara D. Parsons in the joint net worth statement were acquired only with income of petitioner.

*Joseph N. Romm*, T.C. Memo. 1956–104, affirmed and remanded 245 F. 2d 730 (C.A. 4, 1957), certiorari denied 358 U.S. 833 (1958), like the case at bar, involved a determination of a joint deficiency based on a statement of the joint net worth of husband and wife. We found that the returns involved in the proceeding had been the separate individual returns of the husband, and that the wife had filed no returns for the years in question. We did proceed to determine the amount of the husband's deficiency on the basis of the joint net worth state-

ment, but the crucial point is that the parties had stipulated which assets in the joint net worth statement were the wife's, and we were able to find from the record which of those assets acquired in each of the years before us were acquired with her income and which with her husband's income. Unlike the case before us, we were thus enabled to determine the amount of her income and consequently to compute the husband's net income from the joint net worth statement.

In *William G. Lias*, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956), certiorari denied 353 U.S. 935 (1957), respondent was faced with a difficult problem. Lias was the kingpin of a group, consisting entirely of family members and including himself, his wife, his brother, and brothers-in-law, which owned a number of separate partnerships and corporations, at least some of which operated gambling casinos, slot machines, bars, and vending machines. Assets were shifted freely from the name of one to the name of another, and there was no significance to the name in which assets were held at any one time; Lias contended, in fact, that all family assets were his to do with what he wished.

In this confused state of affairs respondent drew up a statement of the net worth of the whole family group. Respondent made the determination of Lias' deficiency by taking the family net worth increases thus computed and subtracting therefrom the amounts determined by respondent, on the basis of their own income tax returns, to have been the net income of the remaining members of the family group. It is emphasized that respondent's determination of deficiency related to Lias *alone*, and that it was based in part on determinations made by respondent as to the amounts of the net incomes of the other persons whose assets were included on the net worth statement relied on by respondent, and that the determination of Lias' deficiency was thus presumptively correct. *Lias* v. *Commissioner*, 235 F. 2d 879 (C.A. 4, 1956).

Unlike *William G. Lias, supra*, and also such cases as *Richard F. Smith, supra*, and *Robert Leslie Bowlin, supra*, respondent's determination was not directed to petitioner's income alone, however. It was a determination of the deficiency of "William H. and Sara D. Parsons," made on the assumption they had filed joint returns. Also unlike Lias, there was no determination as to the net income of Sara D. Parsons, alone, which if present could be subtracted from the determination of joint net income to reach a determination of petitioner's net income that would then possibly be presumed to be correct. Nor was there a determination that Sara D. Parsons had no income. "[T]he presumption of * * * correctness does not extend to * * * findings which the Commissioner has never made." *Taylor* v. *Commissioner*, 70 F. 2d 619 (C.A. 2, 1934), affirmed sub nom. *Helvering* v. *Taylor*, 293 U.S. 507 (1935).

Even if we were to assume that the determination of the joint net income of petitioner and Sara D. Parsons should be entitled to some presumptions as to the correctness of the mediate determinations therein in this proceeding, which ultimately concerns only petitioner's net income, the record does not enable us to find the amount of Sara D. Parsons' net income and reach a determination of petitioner's net income thereby which might be entitled to the basic presumption. As we have seen, Sara D. Parsons did have some net income in each of the years in question, and, as noted above, we cannot honestly say from this record that petitioner's allocable share of the joint net worth increases was any greater than his specific items of unreported income which we have found.

The record before us makes it very clear that the ultimate determination made by respondent in this case, as applied to petitioner alone, is both arbitrary and excessive, and we so hold. It is equally clear that there are no calculations we can make from the record to determine petitioner's entire net income, working back from any presumptions that might still attach to the determination of the amounts of joint net income in the years in question. Accordingly, under the peculiar facts of this case, the usual presumption of correctness must be put aside.[6] *Helvering* v. *Taylor*, 293 U.S. 507 (1935).

Our understanding of what we must do in this situation is to determine the amounts of petitioner's unreported net income ourselves, without regard to any presumptions, doing "the best we can with what we have." *Nat Harrison Associates, Inc.*, 42 T.C. 601, 622 (1964), on appeal (C.A. 5, Oct. 16, 1964.) And see *Thomas A. Talby*, 20 T.C. 715, 721 (1953). We turn, then, to a consideration of our findings of fact.

Petitioner's unreported net income for each year includes the amounts spent in each of the respective years for timberland which was fraudulently expensed in the year of purchase, the amounts of which have been found by us. Since such timberland was still on hand, uncut, at the end of the years before us, we need not be concerned with the question of whether any deductions, which might otherwise have been taken anyway through petitioner's unduly lax inventory methods, should be allowed in respect of these purchases in any of the years before us. For purposes of the computation of the deficiencies and additions to tax, we point out that we have found the adjustment made by Agent Donnelly to the 1944 closing inventory to

---

[6] *Cf. Hoffman* v. *Commissioner*, 298 F. 2d 784 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, where it was pointed out that if a separable part of respondent's determination is found erroneous the presumption as to the rest *does not* fall unless the error reveals an arbitrary attitude or unless, as is the case here, the error affects the entire deficiency.

have been unrelated to petitioner's failure to include these amounts of purchased timberland in closing inventory.

Petitioner's income for 1946 and 1947 must be increased by the amounts of Parsons Bros. lumber inventory which was used in the construction of rental properties but expensed in those years through the Parsons Bros. inventory.

Petitioner reported no income from poultry operations in the years before us, though substantial deposits were made in the bank account maintained by him for this business, in which business Sara D. Parsons was not a participant. Although it is impossible to compute petitioner's net poultry income from his books and records, we are convinced the business was profitable in each year, and with the case in its present posture we shall make an educated estimate as to the amount of that profit to petitioner. *Algernon Blair, Inc.*, 29 T.C. 1205 (1958), acq. 1958-2 C.B. 4. Relying heavily on the proof as to the degree of profitability of his poultry operations with Manogue, it is our best judgment that petitioner's unreported net profit from the poultry business was 4 percent of the total amounts deposited in the poultry account in each year. More precision than this is not necessary. See *Algernon Blair, Inc.*, *supra; Nat Harrison Associates, Inc.*, *supra.*

In 1947 petitioner received $8,500 for the sale of rights to cut timber on land he had just purchased for $8,500. Our best judgment is that the price paid by petitioner for the property is allocable $1,000 to the land and $7,500 to the timber. Consequently petitioner had income of $1,000 in 1947 with respect to this item.

In each of the years petitioner received a token compensation for serving as a member of the Seaford City Council, and in 1945, 1946, and 1947 he received slightly greater amounts as a director of the Seaford Trust Co. Since his expenses offset his gross income from each of these sources, no understatement of net income is attributable to these items. Cf. Rev. Rul. 55–109, 1955–1 C.B. 261; *Edwin T. Pollock*, 10 B.T.A. 1297 (1928); *Green* v. *Bookwalter*, 207 F. Supp. 866 (W.D. Mo. 1962).

Petitioner had unreported income in 1946 and 1947 from the sale of some Parsons Village lots. The basis of the lots sold, for purposes of computing the gain on the sale, will be determined by apportioning the total Parsons Village costs to each of the 46 lots pro rata.

The record affords no rational basis for exercising our judgment as to an amount of unreported income from the tenant farm operations, but more important is the fact that nothing in the record shows that these operations were profitable. Accordingly we do not find any amount of unreported net income from the farming operations.

The parties will be able to compute the deficiencies and additions to tax from our findings of fact and opinion. If they cannot reach

agreement on allowable depreciation, we will dispose of the matter under Rule 50.

It should here be stated that ordinary income generated by or income from the sale of real or personal property owned by both petitioner and Sara D. Parsons, all of which is controlled by either Delaware or Maryland law, is taxable one-half to each. Under the law of both States real or personal property held in the name of both spouses, and not as a joint tenancy, is held as a tenancy by the entireties. *In re Giant Portland Cement Co.*, 21 A. 2d 697 (Del. 1941); *Annapolis Banking & Trust Co.* v. *Smith*, 164 Atl. 157 (Md. 1933); *Brewer* v. *Bowersox*, 48 Atl. 1060 (Md. 1901). By virtue of the Married Woman's Property Acts, enacted by both States, at least in the absence of an agreement by the parties as to a different splitting of the income and in the absence of collection of all of the income by one party alone, of neither of which there is evidence in this case, each is entitled to one-half the income from such property. *Brown* v. *Brown*, 103 A. 2d 856 (Md. 1954); *In re Cochran's Real Estate*, 66 A. 2d 497 (Del. 1949). From this the rule as to the splitting of ordinary income or income on the sale of such property in this case follows. *George E. Saulsbury*, 27 B.T.A. 744 (1933); *Paul G. Greene*, 7 T.C. 142 (1946), acq. 1946-2 C.B. 2; *Edwin F. Sandberg*, 8 T.C. 423 (1947), acq. 1947-1 C.B. 4. It likewise follows that petitioner is entitled to only one-half of the deductions allowable for depreciation with respect to any such property. Cf. *Oren C. White*, 18 T.C. 385 (1952).

Petitioner objects to respondent's use of evidence of Federal documentary stamps to prove the cost of the great bulk of the real estate involved in this case. With the case in its present posture, the only property with respect to which this is significant is Delaware real estate. Initially, we observe that the best evidence rule is not violated here by proof of the amount of the deed stamps through the records of a Delaware county recorder, since such individual is required by State law to record all "annexations" to documents presented for recording. Del. Code Ann. tit. 9, sec. 9606; D.C. Code Ann., sec. 14-402. Computation of the consideration from the deed stamps gives rise to a presumption as to the cost of the property. *In re M'Geehin's Will*, 134 Misc. 334, 235 N.Y. Supp. 477 (1929); *Flynn* v. *Palmer*, 270 Wis. 43, 70 N.W. 2d 231 (1955); *Park Investment Co.* v. *Board of Revision*, 179 N.E. 2d 784 (Ohio App. 1962). Since this presumption is not rebutted by any evidence in the record, we accept such stamps as establishing the cost of such property herein, particularly in view of the procedural context in which the determination of the understatement of petitioner's net income here sits.[7]

---

[7] The situation referred to in *W. B. Counts*, 42 T.C. 755 (1964), is entirely different from the one before us.

Petitioner urges that respondent's determinations are invalid in their entirety for the years 1943, 1944, 1946, and 1947 because respondent commenced a reexamination of petitioner's books and records for those years without providing petitioner with a letter from the Commissioner as provided in section 3631,[8] now section 7605(b). This issue was not raised in the pleadings.

We have recently had occasion to consider this contention in another case, and we there held that where the petitioner had knowledge of the second examination of such books and records, and consented to it, he has no cause for complaint under these sections. *M. O. Rife, Jr.*, 41 T.C. 732 (1964), on appeal (C.A. 5, July 23, 1964). Such knowledge and consent, constituting a waiver, could not be more clear than in this case, and we follow the *Rife* case.[9]

Petitioner has not pressed an objection to the determination of an addition to tax under section 294(d)(1)(B), and we hold the addition proper.

*Decision will be entered under Rule 50.*

---

[8] SEC. 3631. RESTRICTIONS ON EXAMINATION OF TAXPAYERS.

No taxpayer shall be subjected to unnecessary examinations or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

[9] And see *United States* v. *Powell*, 379 U.S. 48 (1964), and *Ryan* v. *United States*, 379 U.S. 61 (1964).