Estate of Max Steinberg, Deceased, Pearl Steinberg, Executrix v. Commissioner. Estate of Max Steinberg, Deceased, Pearl Steinberg, Executrix and Pearl Steinberg v. Commissioner.
Estate of Steinberg v. Commissioner
Docket Nos. 67143, 67144.
United States Tax Court
T.C. Memo 1965-244; 1965 Tax Ct. Memo LEXIS 86; 24 T.C.M. (CCH) 1250; T.C.M. (RIA) 65244; September 10, 1965
*86 On the evidence, held, respondent's determination of fraud under the increase in net worth method, for the years 1947, 1948, and 1949 as to Max Steinberg's individual returns, not sustained. Respondent's determination of fraud in the joint returns filed by petitioners for 1950 and 1951, sustained. George T. Altman, 233 S. Beverly Dr., Beverly Hills, Calif., for the petitioners. H. Kent Holman, Robert L. Gnaizda, and Aaron S. Resnik, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: These proceedings, consolidated for hearing and decision, involve deficiencies and additions to tax for the years 1947 to 1951, inclusive as follows: Max Steinberg
Additions to Tax
Sec. 293(b)
Sec. 294(d)
Docket
Deficiency
I.R.C.
I.R.C.
No.
Year
in Tax
1939
1939
67143
1947
$30,445.98
$15,222.99
$2,309.23
67143
1948
7,853.44
3,926.72
609.99
67143
1949
32,528.38
16,264.19
4,937.36
Max Steinberg and Pearl Steinberg
67144
1950
$16,421.31
$8,210.65
$2,676.44
67144
1951
13,859.30
6,929.65
1,141.75
Respondent now concedes that petitioners are not liable for the additions *87 to tax under section 294(d)(2) for underestimation of tax. This reduces the 1949 section 294(d) addition from $4,937.36 to $2,962.42, and the 1950 section 294(d) addition from $2,676.44 to $1,605.84. Fraud is the principal issue involved in all the years. The deficiencies were determined on the basis of increased net worth and personal expenditures. Findings of Fact Some of the facts have been stipulated and are so found. Petitioners, Max and Pearl Steinberg, during the taxable years involved, were husband and wife, residing at New York, N. Y. They filed joint returns for 1950 and 1951, and for the years 1947, 1948, and 1949 filed separate returns. All of the returns were filed with the collector of internal revenue, Upper Manhattan District. Max Steinberg is now deceased (date of death March 3, 1963), and his executrix, Pearl Steinberg, has been substituted as petitioner in Docket No. 67143. Prior to her marriage to Max Steinberg, Pearl Steinberg had been married to Benton P. Rothbard, from whom she was divorced in 1941. She and Max Steinberg were married in 1942. They were then both in their middle 40s. The net income reported by Max Steinberg, hereinafter sometimes *88 referred to as petitioner, in his 1947, 1948 and 1949 returns, and by him and Pearl Steinberg in their joint returns for 1950 and 1951, and their net income for those years, as determined by respondent was as follows: Max Steinberg
1947
1948
1949
Reported
$ 6,804.56
$ 7,054.66
$ 7,421.05
Determined
59,406.36
26,058.97
66,255.83
Max and Pearl Steinberg
1950
1951
Reported
$13,317.34
$ 9,003.48
Determined
52,051.09
42,630.25
Petitioners, either jointly or separately, maintained a number of bank accounts in the New York area. Some of these accounts were opened in the names of their relatives, or the relatives were named as co-owners. Some or all of the relatives signed signature cards and also signed blank withdrawal slips which Pearl retained. Following is a list of such bank accounts showing the bank, the title of the account, the date opened, the date closed, and the balances in such accounts at the close of the years 1946 to 1951, inclusive: Account
Date
Bank
Account in Name of
Number
Opened
Closed
12/31/46
Chase National Bank
Max & Pearl
Checking
10/11/43
7/14/52
$2,189.79
Steinberg
73rd St. & Broadway,
N.Y.C.
Federation Bank &
Pearl Steinberg
Checking
5/25/48
12/12/51
Trust Co.
34th St. & 8th Ave.,
(Trfd. to 499718)
N.Y.C.
Bowery Savings Bank
Thelma Grose
374547
4/27/42
11/2/51
174.13
34th St., N.Y.C.
i/t/f Pearl Davis
Bowery Savings Bank
Pearl Steinberg
394710
4/6/44
7/21/52
1,829.07
34th St., N.Y.C.
Bowery Savings Bank
Sidney Davis
411731
10/4/45
7/23/52
845.58
34th St., N.Y.C.
Bowery Savings Bank
Pearl Steinberg
435073
6/30/47
7/21/52
34th St., N.Y.C.
Bowery Savings Bank
Robert or Bertha
44001
12/8/47
7/23/52
34th St., N.Y.C.
Arndt
Bowery Savings Bank
Pearl Steinberg,
469155
11/3/49
12/28/51
i/t/f
34th St., N.Y.C.
Laura Jean Arndt
Bowery Savings Bank
Thelma K. Friedman
499718
11/2/51
12/28/51
34th St., N.Y.C.
or Pearl Steinberg
Suffolk Co. Fed.
Pearl Steinberg
11073
10/3/47
7/3/52
Savings
& Loan
1/12/48: or Max
Babylon, N. Y.
Steinberg
Central Savings Bank
Sidney Davis
33529
1/25/49
12/28/51
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
Pearl Steinberg,
333530
1/25/49
12/28/51
i/t/f
73rd St. & Broadway,
Bertha Arndt
N.Y.C.
Central Savings Bank
Pearl Steinberg
333531
1/25/49
7/25/52
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
Pearl Steinberg and
(Trfd. to 359395)
73rd St. & Broadway,
Dorothy Grose
334248
2/15/49
9/24/51
N.Y.C.
Central Savings Bank
Pearl & Max
340563
10/3/49
12/28/51
Steinberg
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
Pearl Steinberg,
341477
11/4/49
12/28/51
i/t/f
73rd St. & Broadway,
Jean Arndt
N.Y.C.
Central Savings Bank
Thelma Friedman and
359395
9/24/51
1/5/53
73rd St. & Broadway,
Pearl Steinberg
N.Y.C.
Beverly Hills Nat'l
Pearl & Max
Checking
12/17/51
9/4/52
Bank
Steinberg
& Trust Co.
9600 Santa Monica
Blvd.
Beverly Hills,
California
Totals
$5,038.47
*89 Account Balances As Of
Bank
12/31/47
12/31/48
12/31/49
12/31/50
12/31/51
Chase National Bank
$4,246.39
$4,828.04
$3,645.70
$2,354.70
$11,175.53
73rd St. & Broadway,
N.Y.C.
Federation Bank &
2,428.25
1,660.03
2,639.51
Trust Co.
34th St. & 8th Ave.,
N.Y.C.
Bowery Savings Bank
579.15
1,226.58
2,935.86
4,277.70
34th St., N.Y.C.
Bowery Savings Bank
940.49
1,285.68
2,864.07
2,175.88
69.73
34th St., N.Y.C.
Bowery Savings Bank
1,618.92
3,320.18
5,378.94
5,157.80
9.95
34th St., N.Y.C.
Bowery Savings Bank
1,281.64
1,300.91
5,059.00
6,148.42
33.64
34th St., N.Y.C.
Bowery Savings Bank
65.00
1,516.14
1,998.97
4,346.23
68.24
34th St., N.Y.C.
Bowery Savings Bank
3,668.93
5,387.59
34th St., N.Y.C.
Bowery Savings Bank
34th St., N.Y.C.
Suffolk Co. Fed.
905.24
4,821.93
4,981.14
5,106.44
5,234.88
Savings
& Loan
Babylon, N. Y.
Central Savings Bank
1,987.48
5,169.44
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
1,977.53
4,840.20
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
1,902.01
3,019.12
26.22
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
73rd St. & Broadway,
424.83
658.58
N.Y.C.
Central Savings Bank
1,989.73
4,184.93
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
430.00
3,364.07
73rd St. & Broadway,
N.Y.C.
Central Savings Bank
904.90
73rd St. & Broadway,
N.Y.C.
Beverly Hills Nat'l
1,500.00
Bank
& Trust Co.
9600 Santa Monica
Blvd.
Beverly Hills,
California
Totals
$9,636.83
$20,727.71
$40,904.22
$58,830.61
$19,023.09
*90 In making an analysis of the above bank accounts, the examining revenue agents found a number of deposits which they could not trace to their source, including currency deposits of $14,883.07 in 1949, $22,000 in 1950, and $8,690 in 1951, and check deposits, during the three years, of $7,678.29, $7,585.22, and $16,948.39, respectively. During all of the years involved, and since 1920, petitioner was employed as a revenue agent by the Internal Revenue Service in New York. In 1943 he was made "Group Chief" and so served until 1949 when he resumed the duties as a revenue agent. There were 28 to 40 revenue agents under his supervision while he was serving as Group Chief. He retired from the Internal Revenue Service in February 1951. Pearl also was employed by Internal Revenue Service, as a secretary, from 1918 to about the time of her marriage to petitioner. Petitioners moved to California in January 1952. Petitioner's salary for the years 1947, 1948, and 1949, as reported in his returns, was $7,304.56 in 1947, $7,554.61 in 1948, and $7,921.05 in 1949. He reported no other income in those years. These salary checks were deposited in a joint bank account which he and Pearl maintained *91 at the Chase National Bank, New York. Their household expenses were paid by checks drawn on that account. The income reported by petitioner and Pearl in the joint returns filed for 1950 and 1951, was as follows: 1950
1951
Salary (U.S. Treas.
Dept.)
$ 8,161.43
$ 2,022.12
Dividends
2,931.75
4,757.38
Interest
2,944.23
2,966.81
Gains on Sale of Capi-
tal Assets
279.93
80.33
Income from annuities
176.84
Total adjusted gross
income
$14,317.34
$10,003.48 The standard deduction was taken in all of the returns involved. Respondent's determination of the deficiencies herein was based on net increase in assets and personal expenditures. His computations are as follows: ASSETS:
12/31/46
12/31/47
12/31/48
Cash in transit
0
0
0
Cash in banks
$ 5,038.47
$ 9,636.83
$ 20,727.71
U.S. Government bonds
0
0
56.25
Real Estate Mortgages
0
43,100.00
42,000.00
Stocks and Bonds
20,366.49
23,243.38
31,007.14
Other loans and investments
0
0
4,000.00
Automobile
0
0
0
Furs and jewelry
0
2,350.00
2,350.00
Due from broker
14.03
1,084.24
0
Total Assets
$25,418.99
$79,414.45
$100,141.10
LIABILITIES: Due to broker
0
0
0
Total Liabilities
0
0
0
Net Worth
$25,418.99
$79,414.45
$100,141.10
Less: Net Worth end of preceding
year
25,418.99
79,414.45
Increase in Net Worth
$53,995.46
$ 20,726.65
Plus: Personal living expenses and
other unallowable amounts paid as
determined
5,910.90
5,832.32
Adjusted gross income, as corrected
$59,906.36
$ 26,558.97
Adjusted gross income, per return
7,304.56
7,554.66
Understatement of income
$52,601.80
$ 19,004.31
*92 ASSETS:
12/31/49
12/31/50
12/31/51
Cash in transit
0
0
$ 48,679.85
Cash in banks
$ 40,904.22
$ 58,830.61
19,023.09
U.S. Government bonds
225.00
318.75
1,837.50
Real Estate Mortgages
54,850.00
53,200.00
45,650.00
Stocks and Bonds
38,375.62
55,161.38
89,953.66
Other loans and investments
19,000.00
21,750.00
14,750.00
Automobile
2,436.67
2,436.67
2,436.67
Furs and jewelry
5,147.60
7,537.60
5,187.60
Due from broker
0
0
0
Total Assets
$160,939.11
$199,235.01
$227,518.37
LIABILITIES: Due to broker
$ 3.14
$ 762.50
0
Total Liabilities
$ 3.14
$ 762.50
0
Net Worth
$160,935.97
$198,472.51
$227,518.37
Less: Net Worth end of preceding
year
100,141.10
160,935.97
198,472.51
Increase in Net Worth
$ 60,794.87
$ 37,536.54
$ 29,045.86
Plus: Personal living expenses and
other unallowable amounts paid as
determined
5,960.96
15,514.55
14,584.39
Adjusted gross income, as corrected
$ 66,755.83
$ 53,051.09
$ 43,630.25
Adjusted gross income, per return
7,921.05
14,317.34
10,003.48
Understatement of income
$ 58,834.78
$ 38,733.75
$ 33,626.77 It is stipulated that the figures in the above tables relating *93 to "personal living expenses and other unallowable amounts paid as determined" are correct. At all times during the 1942-1949 period, Pearl kept safe-deposit boxes at one of the New York banks. The boxes were registered in her name with petitioner sometimes designated "deputy." Pearl kept the key to the boxes and only she had access to them. Pearl traded on the stock market from time to time, but never to any very great extent. Her brokerage account had small debits at the close of 1946 and 1948, a credit of $10,804.24 at the close of 1947, and a deficit of $762.50 at the close of 1950. In 1949 Pearl purchased an automobile at a cost of $2,436.67 and expended for furs and jewelry $2,350 in 1947, $2,797.60 in 1948, and $2,390 in 1950. In 1951 she received an insurance payment in respect of her furs and jewelry in the amount of $5,000. Either Pearl or petitioner, or the two jointly, purchased savings bonds in the amounts of $2,625 in 1947, $56.25 in 1948, $168.75 in 1949, $93.75 in 1950, and $1,518.75 in 1951. A number of mortgage investments were made by Pearl during the 1945-1950 period. Following is a list of such investments and the payments made thereon, as stipulated *94 by the parties: Mortgage
Date Purchased
Amount
Date Paid
Samuel Peck
Feb. 1, 1947
$13,076.88
May 10, 1954
Rockwald Realty Corp.
Apr. 15, 1947
11,400.00
Feb. 21, 1950
Mary Farrell
May 21, 1947
3,250.00
Oct. 28, 1949
Chas. R. Johnson (Bierman)
Aug. 15, 1947
16,500.00
Still open -
Apr. 9, 1957
Westchester Pines Realty Co.,
Feb. 28, 1949
12,300.00
Dec. 12, 1951
Inc.
Morris Heyman and Wife
Sept. 14, 1949
6,400.00
Oct. 2, 1952
Jerome H. Adler
Mar. 4, 1950
17,500.00
Feb. 28, 1955
It is stipulated that payments on principal on the above mortgages were received as follows: $1,126.88 in 1947; $1,100 in 1948; $5,850 in 1949; $19,150 in 1950; and $7,550 in 1951. On October 25, 1954, petitioner was indicted, along with several others, for "Conspiracy to defraud the U.S. in administration of Internal Revenue Laws, providing apportunity to defraud the U.S. in administration of Int. Revenue Laws, preparing & presenting false and fraudulent affdts. to Bureau of Int. Rev. and unlawfully and corruptly endeavor to influence, intimidate & impede witnesses called before the Grand Jury." Petitioner stood trial in the United States District *95 Court for the Southern District of New York on two of the six counts contained in the indictment, the other four counts having been dismissed, and on March 28, 1955, was found not guilty. The charges against petitioner in the criminal proceeding grew out of his alleged participation in the so-called Pattullo Modes case. That company, a New York dressmaking firm, had concealed and failed to report a large amount of its sales. In an attempt to avoid criminal prosecution, after revenue agents had discovered the concealment, its officers allegedly paid to several law firms large sums of money, including a $40,000 bribe to be paid over to petitioner. The $40,000 was allegedly delivered early in 1949 to Harry T. Scherm, a revenue agent under petitioner's supervision who handled the Pattullo Modes investigation, through the law firm of Schopick and Davis. An accountant associated with that firm, Milton Hoffman, and Davis (Irving Davis), were indicted along with petitioner and others in the conspiracy case. Both pleaded guilty under one count of the indictment and were given suspended sentences. They gave testimony on behalf of the Government in the conspiracy trial. On October 20, 1954, respondent *96 sent a notice of deficiency to Scherm and his wife charging them with receipt in 1949 of unreported income of $40,000. A petition was filed by the Scherms in this Court, Docket' No. 55894. Decision was entered therein on December 12, 1958, based on respondent's stipulation, that no part of the $40,000 was taxable income to the Scherms and that the return filed for 1949 clearly reflected their income. Opinion In the absence of fraud, the deficiencies for the years 1947 to 1950, inclusive, are barred by the statute of limitations. The year 1951 is also barred in the absence of fraud, unless petitioners omitted from reported gross income an amount in excess of 25 percent of their realized gross income for that year (section 275(c)). The deficiencies for all years involved were determined by respondent under the net worth increase and expenditures method. The use of that method in determining taxable income, in the absence of reliable books and records, is no longer questioned. See Holland v. United States, 348 U.S. 121 (1954). In the Holland case, supra, the Court said "We agree with petitioners that an essential condition in cases of this type is the establishment, *97 with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets." The Court further observed that: While sound administration of the criminal law [likewise the civil law] requires that the net worth approach - a powerful method of proving otherwise undetectable offenses - should not be denied the Government, its failure to investigate leads furnished by the taxpayer might result in serious injustice. The evidence here is convincing that during the taxable years the petitioners, as a husband and wife team, were in possession of funds and received income of unidentified origin greatly in excess of gross income reported, and of any previously accumulated funds properly accounted for. There is no doubt, either, that the Government exhausted every reasonable means of investigating the meager leads furnished by petitioners as to the origin of their wealth. The Government's investigation was, for the most part, unrewarding. While the evidence does not support the full amount of petitioners' net worth increase during the taxable years, as determined by respondent, it does show substantial increases over *98 and above petitioners' reported income plus all other nontaxable income or accretions to net worth from proven sources. Petitioners' bank accounts alone increased from a total balance at the end of 1946 of approximately $5,000 to nearly $59,000 at the end of 1950. They held mortgages in those years of from $40,000 to $50,000, and also stocks and bonds in substantial amounts. Petitioners, without ever seriously contesting the correctness or accuracy of the net worth increases determined by respondent, have given several explanations of the sources of their funds. They state first that Pearl acquired them by inheritance from rich relatives and later that they were gifts or inheritances that she had received from an unnamed person or persons before her marriage to petitioner. At trial, for the first time, Pearl stated that the principal donor was a man, since deceased, whom she had expected many years before to marry. In her testimony she refused to identify the alleged donor although ordered by the Court to do so. She testified that because she had "solemnly promised" the donor that she would not disclose his identity and because of his national prominence she preferred to keep his *99 identity secret even at the risk of jeopardizing her interests in the tax litigation. She was unable or unwilling to divulge the dollar amounts of the alleged gifts. As a consequence of her refusal to identify the alleged donor, all of her testimony relating to a cash hoard at the beginning of the tax period was ordered stricken from the record at respondent's insistence. As the record now stands, petitioners' claims of a cash hoard of gifts or inherited funds in an amount sufficient to account for more than a small portion of the increase in net worth in the 1946-1951 period, are unsupported. Even if all of her testimony were still before us, we would reach the same conclusion. We observed her demeanor on the witness stand and have compared her tale of the unnamed suitor who allegedly gave her periodic bags full of cash to be put in her safe-deposit box with her previous statements as to the source of her cash accumulations. We could not give credit to her account even if she had candidly identified for the first time at trial her phantom friend, and certainly her failure to disclose the alleged amount of her cash hoard renders the testimony almost valueless for purposes of an attack *100 on the net worth computation. Even with her testimony standing intact, we would conclude that petitioners failed to overcome the clear and convincing evidence before us of a substantial and ever increasing net worth in the Steinberg joint financial picture. However, the weakness of respondent's position here as to the years 1947, 1948, and 1949 is that his determination of the increased net worth of Max Steinberg, individually, is attributed almost entirely to funds or property standing in the name of or belonging to Pearl. Respondent has not established or proven that any of the property was in fact owned by Max or that he, individually, was the source of its origin. We cannot determine from the evidence before us which increases, if any, were his alone during the years 1947 through 1949. In short, the respondent has not proven any increase in Max Steinberg's individual net worth in any of those years. And while the evidence indicates that the increase in net worth was due in the most part to moneys acquired by Pearl, respondent has not determined deficiencies against her, individually, for any of those years, and her returns for those years are not before us. As we see it, there *101 is no credible evidence linking petitioner, as a likely source of income, to Pearl's increase in net worth. The evidence of record does not establish that Max Steinberg ever received any bribe money from Pattullo Modes or from any other source. There is no evidence before us on which we can find that the $40,000 allegedly paid to Scherm in 1949 was ever paid over to petitioner. We, therefore, conclude that respondent has not borne the burden of proving by clear and convincing evidence that petitioner's individual returns for 1947, 1948, and 1949 were false or fraudulent. William H. Parsons, 43 T.C. 378 (1964). As to the years 1950 and 1951, Docket No. 67144, for which petitioner and Pearl filed joint returns, we have a somewhat different situation. The increase in net worth for those years would, of course, include any income derived by or property belonging to either spouse. The increase in net worth for those years, as determined by respondent, amounted to $37,536.54 and $29,045.86, respectively, and petitioners' personal living expenses and other nondeductible expenditures amounted to $15,514.55 in 1950, and $14,584.39 in 1951. While all of the additions to net *102 worth determined by respondent are not substantiated by the evidence of record, the proven increases are sufficient to show substantial amounts of unreported income in each year. For instance, petitioners' undisputed cash in banks increased from $40,904.22 at the end of 1949 to $58,830.61 at the end of 1950, an increase for the year of $17,926.39. Petitioners' personal expenditures for those years, as determined by respondent, and agreed to by petitioners, amounted to $15,514.55 in 1950, and $14,584.39 in 1951. The total income reported by petitioners was only $14,317.34 in 1950 and $10,003.48 in 1951. The petitioners' use of camouflaged and hidden bank accounts, as outlined in our findings, is cogent evidence of fraud, as is their insistence on furnishing leads to sources of nontaxable funds, which, upon respondent's investigation, proved to be false. On the entire record before us, on the proof of increases in petitioners' net worth, greatly in excess of the income reported in their returns, on the failure of petitioners to furnish respondent with leads from which to establish the sources of their increases, and in the absence of evidence of record here showing that a substantial *103 portion of such increases were from nontaxable sources, we think that respondent has borne his burden of proof of fraud for 1950 and 1951. United States v. Holland, supra; United States v. Massei, 355 U.S. 595 (1958). As to the amounts of the deficiencies, respondent's determination is presumptively correct, and, except as required by our findings or the stipulations introduced by the parties, his determination is sustained. Decision of no deficiency will be entered in Docket No. 67143, and Decision under Rule 50 will be entered in Docket No. 67144.