JOSEPH SCHIAVONE and LORELEI SCHIAVONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schiavone v. Commissioner
Docket Nos. 648-72, 2079-73, 2080-73.
United States Tax Court
T.C. Memo 1975-246; 1975 Tax Ct. Memo LEXIS 126; 34 T.C.M. (CCH) 1057; T.C.M. (RIA) 750246; July 23, 1975, Filed Joseph Schiavone, pro se. Jack R. Selzer, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined that petitioners failed to report gross income in the amount of $20,025.18 for 1963, and that petitioner Joseph Schiavone failed to report gross income of $16,229.25 and $18,715.51 for 1964 and 1965, respectively. Respondent determined the following deficiencies and fraud penalties: Year
Income Tax
Section 6653(b) [1]
Deficiency
Fraud Penalty
1963
$5,114.21
$2,557.12
1964
3,315.93
1,657.97
1965
4,386.65
2,193.33
*127 At trial, however, respondent asserted that the correct amount of omissions from gross income were only $14,107.08 for 1963, $11,671.55 for 1964 and $13,572.07 for 1965. The issues to be decided are (1) the amount of the understatement of gross income, if any, for each year in issue, and (2) what part of such understatement, if any, was due to fraud within the meaning of section 6653 (b). FINDINGS OF FACT Some of the facts have been stipulated and are accordingly found. Petitioners Joseph and Lorelei Schiavone ("Joseph" and "Lorelei"), husband and wife, resided in Cranston, Rhode Island at the time they filed their petitions. They filed a joint Federal income tax return for 1963 with the district director in Providence, Rhode Island, reporting $910 wages and $902.78 gross profit from business, or a total income of $1,812.78. Neither petitioner filed a Federal income tax return for 1964 although Joseph admits he had wages of $2,240. Joseph filed an individual Federal income tax return for 1965 with the Providence district director reporting wages of $560. In 1961 Joseph went to California without any appreciable funds, but with a vague plan to improve his financial position. *128 After six weeks he returned to the East almost penniless. On September 8, 1962, Joseph married Lorelei. Between his return from California and his marriage, petitioner had no steady employment. He occasionally designed costume jewelry, an occupation which paid between $75 and $125 per week. Lorelei graduated from high school in June 1957. In September 1957 she started school at Wheelock College, Boston, with the intention of majoring in primary education. In January 1958, after one semester, she left Wheelock College and soon thereafter went to Syracuse University where she enrolled for several courses in the night program, which she did not complete. She left Syracuse University and in September 1958 enrolled at Rhode Island College, which did not grant any credit to her for the courses she took at Wheelock. At Rhode Island College she took a full-time course schedule and graduated in June 1962, four years after enrolling, with a degree in education. She married Joseph three months later. On March 1, 1955, Joseph and one Eleanor Aloia [2] purchased a building located at 13 Vinton Street, Providence, Rhode Island, on which Joseph has paid all of the mortgage payments and property *129 taxes. During the years in issue, Joseph rented a portion of the first floor of the building to a social club, and the remainder was occupied by Joseph's business, Joe's Variety Store. The upstairs rooms were rented to a tenant. The building bore the sign "Joe Schiavone and Company, Import and Export." The social club, consisting of approximately 30 members, gathered periodically at Joseph's building to play cards for money. From these games Joseph took what he called "a cut of the action." In addition, Joseph was paid rent by the club for the use of the premises. Over the years, Joseph has held the positions of steward, treasurer and vice-president of the social club. No financial records were kept by the club. For the taxable years 1963, 1964 and 1965 Joseph failed to report in income his "cut of the action", the rent paid by the club or the rent paid by the upstairs tenant. On the 1963 joint Federal income tax return the sum of $2,463.47 was reported as gross receipts from Joe's Variety Store. Joseph kept no records for this business. Joseph also failed to report wages of $2,240 for *130 1964. Despite the sign on the building indicating otherwise, the import-export business was never developed. Nothing was ever sold, nor were records kept. On April 5, 1964, a Rhode Island State policeman stopped Joseph for questioning. Joseph told the policeman that he was in the import-export business, doing business under the name of International Import and Export from the Vinton Street building. He said that he imported and sold glass tables and chairs from Japan and women's shavers from Switzerland. In his coat Joseph was carrying a paper bag containing $1,204.89 in denominations of twenties, tens, fives, ones and change. He stated that he had this money with him because he was on his way to the Boston docks to purchase items for his business. During the years in issue, Joseph was associated with one Willie Marfeo, a professional gambler. Money often changed hands between Marfeo and Joseph. Willie Marfeo was murdered in 1966. On January 6, 1965, Joseph appeared before the Honorable Charles S. House of the Hartford County Superior Court on charges of larceny in an amount in excess of $2,000 and conspiracy to commit larceny. The court ordered the trial to begin later the same *131 day, but at 3:00 p.m. Joseph failed to appear. Declaring petitioner's bond of $7,500 forfeited, Judge House issued a bench warrant and set new bond at $15,000. On April 12, 1965, Joseph surrendered himself in Hartford and was later released under the $15,000 bond. After pleading guilty to failure to appear according to bail bond, Joseph was sentenced on June 25, 1965 to one year imprisonment in the Connecticut State jail. After five months he was released. On May 11, 1970 Joseph attended a conference with a revenue agent and a special agent. Under questioning he stated that he received no inheritance from his parents, that he was unable to remember if he had any cash on hand at the beginning of 1963, 1964 and 1965, and that he never kept records. He further stated that on November 13, 1963 when he and Lorelei purchased their home, they had no more than $8,000 to $10,000, most of which was used to buy the residence. When asked how petitioners were able to maintain their standard of living on a total gross income of approximately $2,500 for three years, Joseph stated that his father-in-law, Max White, gave them gifts or loans. Subsequently Max White was interviewed by the agents. *132 In a sworn affidavit Max White declared that he gave or loaned petitioner nothing in 1963, $200 in 1964 and $1,000 in 1965. Respondent then began a full-scale investigation of petitioners. In order to determine whether they had any cash on hand at the beginning of the taxable years 1963, 1964 and 1965, respondent circularized banks, lending institutions and brokerage houses in the New England area, asking whether petitioners maintained any accounts. These institutions replied that petitioners did not maintain any regular accounts with them other than the mortgage account for their home. Because of this information and the fact that the petitioners would not furnish respondent with any records of their business activities, respondent reconstructed petitioners' taxable income for the years in issue by the cash expenditure method. Joseph did not allow the respondent's agent to talk with his wife. However, on January 22, 1971, Lorelei called the special agent and told him that because petitioners paid for everything in cash, the agents could not possibly develop an income tax case against them. Moreover, she asked the special agent not to mention to Joseph that she called. The parties *133 have stipulated that during the taxable year 1963 petitioners made a total of $9,629.96 in documented cash expenditures, detailed in the margin. [3] From an analysis of petitioners' style of life, a survey of general consumer expenditures [4] and the Consumer Price Index, respondent determined that petitioners made additional cash expenditures totaling $6,290. [5]
*134 The parties have also stipulated that during the taxable year 1964 petitioners made a total of $6,384.55 in documented cash expenditures. [6] Using the inferential analysis described above, respondent determined that an additional $5,287 in cash was spent. [7] The parties have further stipulated that during the taxable year 1965 petitioners made a total of $11,135.07 in documented cash expenditures. [8] To this, respondent added an additional $3,997, calculated as described below. [9] *135 OPINION The two issues presented for decision are (1) to what extent, if any, petitioners understated their income for the years 1963, 1964 and 1965; and (2) whether all or part of any understatement was due to fraud. Except for two minor modifications we find for respondent on both issues. (1) Understatement.
(a) Amount of unexplained cash expenditures.
In 1963 petitioners reported $1,812.78 of wages and gross profit from business. No return was filed by petitioners in 1964. In 1965 Joseph reported $560 of wages. Thus, for the three years here in issue petitioners reported a total income of $2,372.78. Petitioners kept no books or records. Petitioners have conceded that during the years they made the following cash expenditures: 1963
$ 9,629.96
1964
$ 6,384.55
1965
$11,135.07
Section 446 [10] authorizes respondent, in the absence of a regularly utilized method of accounting which *136 clearly reflects income, to compute a taxpayer's income in any reasonable manner. Using the cash expenditure method of income reconstruction, respondent determined that petitioners made additional cash expenditures during the years in issue. Specifically, by using statistically sound inferential methods which reflected both the petitioners' individual economic life-style and generalized consumer expenditures, respondent determined that the following additional amounts were spent by petitioners: 1963
$6,290
1964
5,287
1965
$3,968 See Joseph F. Giddio,54 T.C. 1530 (1970). These figures include the assumption that for the years 1963, 1964 and 1965, $124, $126 and $100, respectively, were spent on alcoholic beverages. They also take into account the fivemonth period in 1965 during which petitioner was incarcerated. *137 Petitioner has done little to discharge his burden of proof. On the other hand, respondent has done a through, painstaking and conservative job of reconstructing petitioners' income, given the intrinsic inexactitude of the indirect method of income reconstruction that was necessarily employed due to the lack of records and the exclusive use of cash. "[When] the taxpayer has defaulted in his task of supplying adequate records, he is not in a position to be hypercritical of the Commissioner's labor." Webb v. Commissioner,394 F. 2d 366, 372 (5th Cir., 1968), affirming a Memorandum Opinion of this Court. In two areas, however, we find that respondent's computations should be modified in petitioners' favor. First, at trial petitioner testified that neither he nor his wife consumed or purchased alcoholic beverages during the years in issue. We find this testimony credible. Secondly, although the statutory notice of deficiency reflected the gifts or loans from Max White described above, in his revised computations for 1964 respondent does not take the $200 gift into account. Respondent did, however, correctly reduce the 1965 unreported income by $1,000, the amount *138 of Max White's gift or loan for that year, in his revised 1965 computations. The revised 1965 computations also took into account the fact that Joseph was incarcerated for a portion of that year. Thus, we find that respondent's revised calculations must be modified as follows: (i) No amounts should be imputed to petitioners as costs of purchased liquor, and (ii) the amount imputed for 1964 should be reduced by $200 to reflect the gift from Max White in that amount. (b) Source of unexplained cash expenditures.
Having decided how much petitioners' unexplained cash expenditures for the years in issue were, we now turn to the question of whether these expenditures were made from taxable or non-taxable sources of funds. Petitioners claim that the differences between their cash expenditures and reported income for the years in issue were from (i) a pre-existing cash hoard, and (ii) gifts or loans from two friends, Willie Marfeo and Billy "the Greek" Yediares. We reject both contentions. (i) Cash hoard. Petitioners claim that on the date of their marriage, September 8, 1962, they possessed $55,000 in cash, $25,000 of which came from Joseph and $30,000 of which came from Lorelei. *139 They further allege that the cash was kept in a small metal box. In 1961 Joseph went to California without funds. After six weeks he returned, having failed to improve his financial posture. Until his marriage in 1962, Joseph worked as a jewelry designer, making no more than $125 per week. To examine Joseph's personal history prior to his marriage is to refute his having a $25,000 cash hoard at that time. Lorelei's testimony of a $30,000 cash hoard at the date of their marriage is similarly unlikely. She testified she obtained the money from modeling and from gifts from various people, and that she kept it in "a little metal box that locked." However, her testimony also indicates she attended college each year between her graduation from high school and her marriage to Joseph. Because Joseph would not permit respondent's agents to talk with Lorelei prior to trial, respondent was somewhat disadvantaged in responding to this claim. Lorelei's story, however, is in direct conflict with Joseph's statement to the revenue agent and special agent that petitioners had no more than $10,000 when they made the downpayment on their home in November of 1963. Lorelei also testified that as of *140 the date of trial $10,000 remained of her original $30,000 cash hoard; this is also in conflict with Joseph's statement to the agents. Considering her testimony as a whole--her demeanor on the stand, her inability to remember details and several inconsistencies within her testimony--as well as the conflicts between her testimony and Joseph's, we feel her testimony is entitled to little weight. (ii) Gifts or loans. Petitioners did not inform respondent prior to trial of the alleged loan from Billy "the Greek" Yediares. [11] Mr. Yediares testified that he loaned Joseph $10,000 in 1964, as well as informal gifts and loans in other years not in issue. Mr. Yediares' testimony, however, suffers from several flaws. First, it is wholly unsupported by documentary evidence. Second, Mr. Yediares, although rightfully exercising his constitutional rights, refused to tell this Court the source of this large sum of money, thus casting doubt on his financial ability to make such a substantial loan. Mr. Yediares failed to report any taxable income during the years he allegedly made the loans or any prior years. *141 Willie Marfeo was murdered in 1966. Both Mr. Yediares and Joseph testified, however, that in 1965 Marfeo gave $10,000 to Joseph. Other than this testimony, no evidence supporting this claim was produced. We are not convinced, is such a transfer of funds did occur, that the funds were loans or gifts rather than taxable income to Joseph. Joseph testified that Marfeo was a gambler and that money often changed hands between them in a "back and forth deal." Petitioners seem to be claiming that Marfeo gave them money out of simple generosity; a more tenable position is that Joseph and Marfeo were engaged in some sort of business dealings, the revenues of which are taxable income. We decline to speculate as to the nature of this business. In conclusion we hold that petitioners have failed to carry their burden of proving that the source of the moneys expended by them in the years in issue was other than taxable income. (2) Fraud.
The burden of proving fraud is upon the respondent. Section 7454(a). This burden must be met by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure. Despite the weightiness of this burden, respondent has satisfied it *142 in this case. Many of the facts which led us to conclude that petitioners understated their income for the taxable years in issue also shed light upon the question of fraud. Although petitioners had income from at least two sources--the variety store and rental of portions of a building--no books or records of any sort were kept. The failure to keep books and records has been viewed as a badge of fraud. William H. Parsons,43 T.C. 378, 395 (1964). The exclusive use of cash in daily transactions also implies fraud. Arthur Engel, a Memorandum Opinion of this Court dated July 31, 1952. Indeed, Lorelei's statement to the special agent that she believed the exclusive use of cash effectively insulated petitioners from tax liability strongly underscores this. Moreover, the large understatement for each of the taxable years in issue itself has much probative value, for "[consistent] and substantial understatement of income is by itself strong evidence of fraud." Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir., 1962), affirming an amended Memorandum Opinion of this Court; John Harper,54 T.C. 1121, 1139 (1970). Furthermore, *143 we add to the foregoing list the further fact that Joseph intentionally made false and inconsistent statements to respondent's agents. In the investigative stage Joseph told the revenue agent and the special agent that gifts or loans from Max White accounted for the petitioners' high standard of living despite low taxable income for the years in issue. After respondent took Max White's affidavit in which this contention was denied, as it was in Max White's testimony at trial, Joseph abandoned this claim. Joseph also told these agents that he and his wife had no more than $10,000 in November of 1963, all of which they used as a downpayment on their home. Yet, at trial it was contended that a $55,000 cash hoard originally existed, of which $10,000 still remains. This type of dissembling is a clear incident of fraud. See United States v. Jett,352 F. 2d 179, 182 (6th Cir., 1965), cert. denied 383 U.S. 935 (1966); Madeline V. Smith,32 T.C. 985 (1959). We conclude that respondent has carried his burden of proving fraud. To reflect respondent's concessions at trial and the minor modifications described above Decision will be entered *144 under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect for the years in issue.↩
2. The record does not indicate the relationship, if any, of Eleanor Aloia to Joseph.↩
3. The parties have stipulated that during 1963 the following expenditures were made: ↩
a. Binder fee on purchase of residence,
Cranston, Rhode Island.
$ 100.00
b. Increase of binder fee on residence.
900.00
c. Cash payment at closing for residence.
6,910.29
d. Mortgage payments on residence.
112.19
e. Furniture payments to General Motors
Acceptance Corporation.
897.24
f. Home owner's insurance policy for
residence.
$ 114.10
g. Real estate taxes on Vinton Street
property, Providence, Rhode Island.
275.14
h. Mortgage payments on Vinton Street
property, Providence, Rhode Island.
321.00
TOTAL
$9,629.96
4. Specifically, respondent used Bureau of Labor Statistics Report No. 237-57, issued in February 1964. This report contains a survey of family expenditures and income in the Boston area during the period 1960 and 1961. The survey covers 268 families with money income after taxes ranging from less than $1,000 to in excess of $15,000. It reflects the average amounts of expenditures of each income class for various categories of expenses, such as food, shelter, transportation and recreation. ↩
5. Respondent calculated this amount as follows: ↩
Personal Insurance
$ 367
Gifts and Contributions
405
Food Prepared at Home
1,236
Food Away from Home
329
Tobacco
118
Alcoholic Beverages
124
Rented Dwelling (Petitioners did not buy
home until November 1963)
376
Fuel, Light, Refrigeration, Water
337
Household Operations
391
Clothing, Clothing Materials, Services
670
Personal Care
162
Medical Care
352
Recreation
239
Reading
$ 64
Education
105
Transportation
Automobile
724
Other
131
Other Expenditures
160
TOTAL
$6,290
6. The parties have stipulated that during 1964 the following cash expenditures were made: ↩
a. Mortgage payments on residence,
Cranston, Rhode Island.
$1,474.63
b. Furniture payments to General
Motors Acceptance Corporation.
897.24
c. Home owner's insurance policy for
residence.
114.10
d. Real estate taxes on Vinton Street
property, Providence, Rhode Island.
261.70
e. Deposit on purchase of 1964 Buick.
100.00
f. Cash payment for purchase of 1964
Buick.
3,096.00
g. Sales tax on purchase of 1964 Buick.
131.88
h. Mortgage payments on Vinton Street
property.
309.00
TOTAL
$6,384.55
7. Respondent calculated this amount as follows: ↩
Personal Insurance
$ 379
Gifts and Contributions
419
Food Prepared at Home
1,254
Food Away from Home
334
Tobacco
120
Alcholic Beverages
126
Fuel, Light, Refrigeration, Water
342
Household Operations
397
Clothing, Clothing Materials, Services
680
Personal Care
164
Medical Care
357
Recreation
242
Reading
65
Education
107
Transportation
Other Travel and Transportation
136
Other Expenditures
165
TOTAL
$5,287
8. The parties have stipulated that during 1965 the following cash expenditures were made: ↩
a. Mortgage payments on residence,
Cranston, Rhode Island.
$1,885.46
b. Furniture payments to General
Motors Acceptance Corporation.
747.70
c. Home owner's insurance policy for
residence.
114.10
d. Payments to Narragansett Electric
Co.
$ 191.93
e. Payments on Vinton Street property,
Providence, Rhode Island.
188.36
f. Amounts withheld from petitioner's
payroll checks at Michele Jewelry
Co., Inc.
126.02
g. Bailbond payment to Superior Court,
Hartford, Connecticut.
7,500.00
h. Payment to professional bondsman
for $7,500 bail bond.
312.50
i. Medical payments.
69.00
TOTAL
$11,135.07
9. Respondent calculated this amount as follows: Gifts and Contributions
$ 337
Food Prepared at Home
1,010
Food Away from Home
270
Tobacco
97
Alcoholic Beverages
100
Household Operations
298 Although in brief respondent asserted the amount attributable to household operations to be $327, his expert witness placed this figure at $298. We can only conclude that respondent's counsel made an inadvertent error in transcribing his expert's testimony.
*↩
Clothing, Clothing Material, Services
548
Personal Care
132
Recreation
194
Reading
51
Education
86
Transportation
Automobile
$ 603
Other Travel and Transportation
109
Other Expenditures
133
TOTAL
$3,968
10. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. * * *↩
11. In the audit stages of the investigation Joseph stated that Max White, Lorelei's father, provided the couple with generous gifts of money during the years in issue and that these gifts enabled them to maintain a high standard of living. Respondent then took the affidavit of Max White, who disputed these contentions. At trial, Joseph abandoned his original claim.↩