ESTATE OF JOSEPH H. O'BRIEN, Deceased, LUCILLE S. NOEL, Executrix, and LUCY V. O'BRIEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent MACADAM CONSTRUCTION COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
Estate of O'Brien v. Commissioner
Docket Nos 4178-74, 4179-74
United States Tax Court
T.C. Memo 1978-185; 1978 Tax Ct. Memo LEXIS 328; 37 T.C.M. (CCH) 799; T.C.M. (RIA) 780185; May 22, 1978, Filed Victor Chini, for the petitioners. Bernard R. Baker, III, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax [1] Petitioner
Year
Deficiency
Under Sec. 6653 (b)
O'Brien
1966
$4,330.32
$2,165,16
1967
3,334.47
1,667.24
1968
4,153.58
2,076.79
1969
4,168.28
2,084.14
Macadam [2]
1966
$4,400.93
$ 2,200.47
1967
1,343.11
671.56
1968
1,764.13
882.07
1969
3,124.28
1,562.14
*329 The issues for decision are: (1) Whether petitioners understated their taxable income for the years 1966 through 1969. (2) Whether, if petitioners did understate their taxable income for these years, any part of the underpayments of income tax in each of the years in issue was due to fraud. (3) Whether the statute of limitations bars the assessment and collection of the deficiencies asserted against Macadam for the years 1966 and 1967. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Joseph H. O'Brien (Joseph) and Lucy V. O'Brien (Lucy) were husband and wife and resided in Fulton, New York at the time their petition was filed herein. They timely filed joint Federal income tax returns on a cash basis for the taxable years under consideration with the Internal *330 Revenue Service Center at Andover, Massachusetts. The O'Briens at various times consented to extensions of the period for assessment of a deficiency against them individually for each of the years in issue. Joseph died on August 25, 1975, and his estate has been substituted as a party in this proceeding pursuant to an Order of the Court dated January 22, 1976. Petitioner, Macadam Construction Company, Inc. (Macadam), is a corporation organized in 1949 under the laws of the state of New York. When the petition was filed Macadam had its office and principal place of business at Fulton, New York. Macadam is on the accrual basis of accounting and filed its corporate income tax returns for the calendar years 1966 through 1968 with the District Director at Buffalo, New York, and for the calendar year 1969 with the Internal Revenue Service Center at Andover, Massachusetts. Valid waivers of the statute of limitations for assessment of a deficiency were executed on behalf of Macadam for the years 1968 and 1969 only. Prior to and during the years in issue Macadam was a contractor in the blacktop paving business. Its business operations were conducted in the Fulton, New York area. *331 Joseph was the president of Macadam and owned 2 percent of its outstanding stock. His responsibilities as president primarily involved the acquisition and supervision of paving contracts and making collections, duties which took him away from the corporate office. Lucy was the treasurer of Macadam and owned 98 percent of its outstanding stock. Lucy's primary duties as treasurer consisted of the supervision of Macadam's corporate office and the preparation of the corporate books of account and records. Due to the seasonal nature of Macadam's business, some of its activities were suspended during the winter months. Joseph and Lucy therefore spent winters in Florida, where the corporate mail, including receipts, was forwarded to them. Macadam maintained a number of corporate checking accounts. Two of the checking accounts were with the Marine Miland Trust Company in Fulton, New York. Of these, one was a regular checking account which was used for payment of the corporate expenses; the other was a special snow removal account.Two additional corporate checking accounts were kept with Florida banks, the Jefferson National Bank (successor to the InterAmerican National Bank) at *332 Sunny Isles, Miami Beach, and the Central Plaza National Bank at Saint Petersburg. The principal business records kept by Lucy for Macadam included bank statements, canceled checks, bank deposit tickets, invoices and job contracts. Prior to 1966, Lucy kept a cash receipts book for Macadam. The cash receipts book served as a record of all checks and cash received by Macadam which were attributable to its business activities. No such book was kept by or on behalf of Macadam for the years 1966 through 1969. During the years in question, Macadam maintained a disbursements journal, although this portion of the business records was the responsibility of an independent accountant.
The bookkeeping system maintained by Macadam contained a personal withdrawal account for the O'Briends. This account was charged whenever the O'Briens withdrew corporate funds from the regular checking account at the Fulton bank for personal purposes. At year's end, the withdrawal account was closed into the account representing the compensation to be paid Joseph and Lucy for the year. If compensation for the year exceeded the amounts withdrawn during the year, the difference was paid at year's end as *333 compensation. The compensation to be paid Joseph and Lucy as officers of Macadam was determined by them at the end of each year, and in the aggregate approximated the net corporate income before reduction for the officers' salaries and any corporate income taxes.Macadam included the following amounts in its corporate income tax returns: Gross
Officer's Compensation
Corporate Year
Receipts
Joseph
Lucy
Taxable Income
1966
$243,094.99
$18,000
$ 7,800
$ 1,812.92
1967
181,437.65
12,000
5,200
(113.04)
1968
239,114.16
24,000
7,800
1,615,49
1969
271,272.51
25,000
17,000
285.05 The amounts listed above as officer's compensation are gross salary, exclusive of excludible benefits. Macadam reported unappropriated retained earnings per books at the beginning of 1966 in the amount of $97,658.56. John R. Lero (Lero), an independent public accountant, has provided accounting and tax return preparation services to Macadam and the O'Briens since 1961 or 1962. The work on these accounts was largely done by Arthur J. Santos (Santos), an accountant, under the general supervision of Lero. During each of the years in issue, Santos visited *334 the Macadam office on a monthly basis for the purpose of preparing a recapitulation of Macadam's receipts for the month and writing up a disbursements journal. Information required by Santos to formulate the monthly summaries of receipts and disbursements was provided by Lucy. Data consisted of deposits in and checks written on the corporate bank accounts in Fulton, New York, supplemented by explanations from Lucy where necessary to distinguish disbursements for business expenses from those for personal expenses. The accountants were never retained to perform an audit of the business records of Macadam. However, in the course of the work they did perform, Lero and Santos occasionally suggested to the O'Briens that their business would benefit from the implementation of more sophisticated accounting procedures for the internal control of costs. Predominant among the suggestions was that Macadam should employ the completed contract (or completed job) method of accounting, a system it did not use. It was estimated that the annual expense for installation of these additional accounting systems would be between $150 and $250 per year. No changes in accounting method were made by *335 Macadam between 1966 and 1969. During the years in question, Macadam's gross receipts consisted of cash and checks received in payment for its blacktopping and paving. All receipts were handled by Joseph and Lucy. Most of the receipts were deposited in one of the corporate bank accounts in New York or Florida. The proceeds from some of the checks and some of the cash receipts were retained by the O'Briens without deposit in any corporate checking account. The following is a summary of the business receipts not deposited to either of the corporate bank accounts in Fulton: Checks Cashed
Cash Re-
Deposits: Florida Accounts
and
ceipts Not Year
Central Plaza
Jefferson
Total
Not Deposited
Deposited
Total
1966
$14,212.00
$7,489.50
* $18,201.50
$2,472.00
$320.00
$20,993.50
1967
9,166.30
9,166.30
585.00
450.00
10,201.30
1968
2,051.52
4,327.24
6,378.76
1,239.07
7,617.83
1969
8,576.98
8,576.98
4,048.20
12,625.18
During these years, Joseph and Lucy converted to their own use in the payment of personal expenses the following amounts of Macadam's *336 business receipts which had been deposited in the corporate accounts in Florida: Withdrawals From Florida Bank Accounts Year
Central Plaza
Jefferson
Total
1966
$3,173.89
$6,674.89
$ 9,848.78
1967
5,186.26
6,399.39
11,585.65
1968
2,626.53
5,807.68
8,454.21 *
1969
1,851.82
4,551.13
6,402.95
Combining these amounts with the corporate receipts listed above that were never deposited in any of the corporate accounts yields the following total amounts of Macadam receipts which were converted by the O'Briens for their personal use. Year
Amount
1966
$ 12,640.78
1967
12,620.65
1968
9,673.28
1969
10,451.25 No checks were written on the corporate bank accounts in Florida for the payment of Macadam's business expenses. Santos prepared the Federal income tax returns of Macadam and of the O'Briens for the years 1966 through 1969. The returns were filled out in pencil, reviewed by the O'Briens, and then typed for filing. Because Macadam maintained no cash receipts book, gross receipts were determined according to the *337 bank deposit method. That is, Santos ascertained the gross receipts of Macadam for a taxable year by computing the total deposits made to the corporate checking accounts during the year. This amount was then adjusted, because Macadam was an accrual basis taxpayer, for any difference in the amounts of accounts receivable held by Macadam at the beginning and the end of the year. Santos' determination of Macadam's gross receipts was, however, only based on deposits made to accounts at the Marine Midland Bank in Fulton, New York. Not having been deposited to the corporate accounts in Fulton, the following amounts were not reported as income (gross receipts) on Macadam's returns: Year
Understatement of Gross Receipts
1966
$20,993.50
1967
10,201.30
1968
7,617.83
1969
12,625.18
In computing the figure to be used as Macadam's yearly gross receipts, Santos regularly inquired of Lucy whether all Macadam's receipts for the particular year had been deposited in the Fulton bank accounts. He would also inquire whether any accounts receivable existed that were not shown on the corporate records. Lucy responded to these inquiries by indicating that all of the receipts *338 of Macadam had been deposited in the Fulton accounts, and that the accounts receivable record provided Santos was complete. Neither Joseph nor Lucy ever advised Santos or Lero of the existence of the Florida bank accounts, nor that they had cashed checks representing Macadam receipts without depositing the proceeds in the corporate bank accounts in Fulton. Moreover, Santos was never advised by either Joseph or Lucy that Macadam receipts not deposited to the corporate accounts in Fulton were used for personal purposes. During the years in question, the accountants never procured the duplicate set of Macadam work invoices in order to compare the total amount billed during a taxable year for work completed with the gross receipts as determined by the bank deposit method. However, the regular corporate checking account in Fulton does reflect the following activity: Marine Midland Bank (Fulton Office) Macadam Construction Co., Inc. Account Number 229 70871 4 Number of Checks
Number of Deposits
1966
1967
1968
1969
1966
1967
1968
1969
January
71
85
98
99
3
2
2
1
February
100
82
68
81
2
1 0
1
March
51
56
37
43
1
0
0
0
April
50
55
48
40
1
2
1
1
May
93
88
6
79
4
3
0
5
June
108
90 110
108
4
6
7
1
July
110
121
140
108
2
5
7
6
August
121
101
109
99
3
4
6
3
September
91
99
99 105
5
3
4
3
October
102
100
104
107
3
3
5
4
November
107
76
107
79
0
5
2
2
December
84
87
95
86
0
2
2
1
*339 Aggregate Monthly Deposits
1966
1967
1968
1969
January
$17,397.28
$28,461.83
$12,578.75
$11,260.30
February
2,287.10
8,279.61
0
2,816.60
March
7,530.00
0
0
0
April
2,354.00
12,847.00
2,300.00
10,264.21
May
12,561.00
7,149.00
0
30,938.65
June
35,543.50
21,390.70
22,769.54
10,447.40
July
17,368.40
22,031.97
38,488.34
47,325.73
August
64,584.44
16,826.07
44,032.80
17,670.79
September
63,268.33
17,117.00
21,061.83
42,977.31
October
15,657.80
22,278.90
41,095.44
62,160.76
November
0
42,267.43
24,091.49
21,282.80
December
0
8,371.96
21,212.58
14,014.82 Finally, the O'Briens' personal checking account records were specifically requested by the accountants, but were never provided.
The audit investigation of the returns filed by the O'Briens and Macadam was begun sometime in late 1969. On November 18, 1970, the O'Briens were visited by a revenue agent (Parks) and a special agent (Kin) of the Internal Revenue Service to discuss the tax returns for the four years beginning with 1966. During that meeting, Joseph told the agents that all of the corporate receipts of Macadam for the years 1966 through *340 1969 had been deposited in the corporate checking accounts in Fulton. At that same meeting, Joseph indicated that during the years 1966 through 1969, no loans had been made between themselves and Macadam, nor had there been repayment of any pre-1966 loans to Macadam by the O'Briens. On June 7, 1972, a meeting was held at Lero's office, attended by Joseph and Lucy, Lero, Santos, a second special agent (Sagar), and revenue agent Parks. During this meeting Joseph stated that Macadam did not keep a cash receipts book after 1965 because it was felt that the bank deposit method employed by Macadam beginning in 1966 was adequate. Joseph told the agents that all Macadam receipts were deposited in the Fulton bank accounts, but later admitted that some receipts had been deposited in the Florida accounts. Joseph also stated he had advised their accountant Lero of the existence of the Florida accounts. However, later during this same meeting, Joseph admitted that the accountants had not been informed about these Florida accounts, nor that funds deposited therein had been used for personal purposes, admissions not contradicted in any way by Lucy. In fact, Lero's first knowledge of the *341 Florida accounts was subsequent to the preparation of the returns under investigation, when informed of their existence by special agent Sagar. This meeting ended when Joseph and Lucy refused to explain, without first consulting with an attorney, why they had failed to disclose this information to their accountants. In the statutory notices of deficiency, respondent determined that taxable income, as reported by Macadam and by Joseph and Lucy, had been understated for each of the years in issue. The understatement of taxable income asserted against the corporate petitioner is equivalent to the amount of Macadam's gross receipts that were unreported during the four years at issue. The understatement of taxable income asserted against the O'Briens is based only upon those amounts diverted from the corporate receipts and actually used by them for personal expenses during each of the years. Respondent also determined additions to tax for fraud against each of the petitioners for such years. ULTIMATE FINDINGS OF FACT 1. Petitioners Macadam and the O'Briens had unreported taxable income for the years 1966, 1967, 1968, and 1969 as determined by respondent in the notices of deficiency. *342 2. At least part of the deficiency for each of the years 1966, 1967, 1968, and 1969 was due to fraud by the O'Briens with intent to evade tax. 3. At least part of the deficiency for each of the years 1966, 1967, 1968, and 1969 was due to fraud on behalf of Macadam with intent to evade tax. OPINION These consolidated cases involve deficiencies and additions to tax for fraud as determined by respondent against Macadam and its two shareholders and officers, Joseph and Lucy O'Brien, for the years 1966 through 1969. The deficiencies result from alleged understatements of taxable income both by the corporation and by the O'Briens. The understatements in Macadam's taxable income are the consequence of the omission of corporate gross receipts from the returns. In the case of the O'Briens, the understatements in their taxable income are based upon those portions of the receipts omitted from the corporate returns that they used to pay personal expenses and did not report as income. The parties have stipulated the amounts of gross receipts omitted from the corporate returns and the amounts of corporate funds used by the O'Briens for personal purposes. The primary issue for *343 our determination is whether any part of the underpayment of taxes by either Macadam or the O'Briens for the years in issue was due to fraud within the meaning of section 6653(b). [3] To the extent the underlying deficiencies are themselves in dispute, they will be considered as incidental to the fraud issue. [4]
Section 6653(b) imposes *344 a 50 percent addition to tax for each taxable year in which any part of the underpayment of tax is due to fraud. The existence of fraud is a question of fact which must be ascertained by an evaluation of all the facts of the case. Stone v. Commissioner,56 T.C. 213, 224, (1971); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent has the burden of proving the existence of fraud by clear and convicing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Fox v. Commissioner,61 T.C. 704 (1974); Beaver v. Commissioner,55 T.C. 85, 92 (1970). To establish fraud, the respondent must prove that petitioners acted with the specific intention of evading a tax believed to be owing. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941), revg. and remg. 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941); Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973). This intention *345 may be inferred from circumstantial evidence, such as proof of conduct calculated to mislead or conceal. Gajewski v. Commissioner,67 T.C. 181, 200 (1976), on appeal (8th Cir. May 23, 1977); Beaver v. Commissioner, supra at 92-93; Pigman v. Commissioner,31 T.C. 356, 370 (1958).In the case of corporate taxpayers which act only through their officers, the requisite fraudulent intent must be imputed from the fraudulent intent of their officers, most typically through the fraudulent handling of corporate transactions. American Lithofold Corp. v. Commissioner,55 T.C. 904, 925 (1971); Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963). Respondent's argument is premised on the theory that the fraud of the corporate officers and sole shareholders will be considered the fraud of the corporation. It proceeds as follows: The O'Briens, in their capacity as officers of Macadam, received all the corporate receipts and possessed complete authority regarding deposit of receipts in the corporate bank accounts. Some receipts were deposited in the Fulton, *346 New York bank accounts, some in the Florida accounts, and some were not deposited. The accountants who prepared the corporate tax returns were required, by the O'Briens' choice of corporate bookkeeping methods, to use the bank deposit method for determining gross receipts of Macadam. Their computations were based only upon deposits made to the Fulton accounts because the O'Briens did not provide any other information. The O'Briens knew that their concealment of the deposits to the Florida bank accounts, as well as the receipts that went undeposited, would prevent entry of this information into the corporate books and records. They therefore controlled whether an item of income in the form of a corporate receipt would ultimately be refected in the income tax returns of Macadam. Consequently, the concealment of these corporate receipts from the accountants who prepared the returns in an aggregate amount exceeding $50,000 over a four-year period evidenced an intent to evade the tax on the income represented by those receipts. Moreover, the diversion of corporate funds to pay personal expenses of the O'Briens, similarly concealed from the accountants, evidenced an intent by the O'Briens *347 in their own behalf to evade the tax on corporate distributions to them. Petitioners argue that the evidence is insufficient to prove that the underpayments were made with the intent to avoid taxes believed to be owing. They contend that the omission of corporate receipts from the corporate returns was not deliberate, but was the fault of their accountants. They maintain that their accountants were given all the relevant information pertaining to the corporate receipts, including the Florida bank accounts, and omission of corporate receipts from the returns was the result of their accountants' negligence. Any omission of taxable income from the returns filed by the O'Briens is similarly attributed to the accountants. Finally, it is asserted that the unreported receipts should not be treated as dividends, but rather as compensation or as loans to the O'Briens--in a manner allegedly consistent with Macadam's accounting practice. Turning first to Macadam, we find that respondent has proven by clear and convincing evidence that Macadam's underpayments of Federal income taxes for 1966 through 1969 were due to its filing fraudulent returns with intent to evade tax. Several factors *348 lead us to this conclusion. One factor is the repeated failure of Macadam to report substantial amounts of income because of its understatement of gross receipts. We recognize that the mere understatement of income, standing alone, is not sufficient to support a finding of fraud. See Nicholson v. Commissioner,32 B.T.A. 977, 989 (1935), affd. 90 F. 2d 978 (8th Cir. 1937); Jenkins v. United States,313 F. 2d 624, 628 (5th Cir. 1963); Anderson v. Commissioner,250 F. 2d 242, 249-50 (5th Cir. 1957), affg. on this issue a Memorandum Opinion of this Court, cert. denied 356 U.S. 950 (1958).Nevertheless, a consistent pattern of underreporting substantial amounts of taxable income over a period of years is effective evidence of fraud. Schwarzkopf v. Commissioner,246 F. 2d 731 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Estate of Hill v. Commissioner,59 T.C. 846 (1973); Farber v. Commissioner,43 T.C. 407, 419 (1965), supp. opinion 44 T.C. 408 (1965). *349 The record clearly shows, and petitioners concede, that Macadam failed to report gross receipts (and consequently gross income) from its paving business in amounts exceeding $51,000 over a four-year period--$20,993.50 for 1966, $10,201.30 for 1967, $7,617.83 for 1968, and $12,625.18 for 1969. These amounts are too significant to have gone without notice by Macadam's officers. This is especially true when these amounts are compared to the almost negligible taxable income reported by Macadam for these years. This consistent and repeated omission of such substantial amounts of income constitutes, without more, persuasive evidence of fraud. However, there is other evidence of fraud.
A second factor we consider significant is the unusual treatment by the O'Briens of the gross receipts which were omitted from the corporate tax returns. By 1966 Macadam was an established business generating significant revenues, apparently in the neighborhood of a quarter million dollars per year. Its business operations were confined to New York State, and it maintained two corporate checking accounts in Fulton, New York. Upon changing to the bank deposit method for determining its gross receipts *350 for taxable years beginning after 1965, the normal procedure for handling receipts would be to deposit all receipts in those New York corporate bank accounts. However, Macadam maintained two corporate checking accounts in out of state banks (Florida) into which corporate receipts were deposited, even though Macadam did no business in Florida. The proffered explanation for the existence and use of the Florida accounts was that the officers spent those winter months during which Macadam's business activities were curtailed in Florida. Since the O'Briens exercised exclusive and complete authority over corporate finances, it apparently facilitated matters to forward the business receipts to them in Florida. However, we do not find this explanation convincing. The Florida accounts, while possibly serving as a convenience to the O'Briens when in Florida, were simply not necessary for the conduct of Macadam's business, nor were they so used. There was consistent activity in the New York checking accounts year round during the years in issue, although there was somewhat less activity during the winter months. But there is no demonstration that the Florida accounts were ever *351 used for Macadam's business purposes, other than for the deposit of corporate receipts. There was, however, substantial activity on these accounts by the O'Briens for their personal expenditures in Florida. Furthermore, the use made by the O'Briens of these out of state bank accounts, when combined with the elimination of the cash receipts book, created the opportunity for the O'Briens to divert corporate receipts to personal use while minimizing the possibility that the omitted receipts would be discovered by the accountants. We therefore view these activities as evidence of conduct calculated to conceal the receipt of income by arranging "affairs to avoid making the records usual in transactions of the kind." [5]Spies v. United States,317 U.S. 492, 499 (1943); see also, Schuermann v. United States,174 F. 2d 397 (8th Cir. 1949), cert. denied 338 U.S. 831 (1949). *352 The significance of the Florida accounts to the issue of fraud becomes even more evident when considered in connection with their concealment from the accountants who prepared the returns. Employing, as Macadam did, the bank deposit method for ascertaining the amount of its gross receipts, the O'Briens were aware that the reliability of this method depends upon all receipts being deposited and all deposits being reported. However, the O'Briens concealed these bank accounts, and thus the gross receipts deposited therein, from accountants Lero and Santos. Moreover, the O'Briens led their accountants to believe that all corporate receipts were deposited in the New York accounts. Thus, the record clearly indicates that the O'Briens failed to supply Macadam's accountants with all the information necessary for preparation of the corporate tax returns. Such an intentional and deliberate failure to disclose adequate information to the accountants preparing the returns constitutes evidence of fraud, strengthening *353 the indications of fraud previously discussed. See Parsons v. Commissioner,43 T.C. 378, 395 (1964); Foster v. Commissioner,391 F. 2d 727, 732 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Drieborg v. Commissioner,225 F. 2d 216, 219 (6th Cir. 1955), affg. on this issue a Memorandum Opinion of this Court; Holbrook v. United States,216 F. 2d 238, 240 (5th Cir. 1954), cert. denied 349 U.S. 915 (1955). Another factor we consider relevant is the series of false statements and concealment of information offered by the O'Briens to investigating Internal Revenue Service agents. When questioned in November 1970 regarding the corporate returns, Joseph told the agents that all the corporate receipts for the years 1966 through 1969 had been deposited in the corporate accounts in Fulton. During a June 1972 meeting, Joseph again stated that all receipts had been so deposited. He later admitted that some receipts had been deposited in the Florida accounts. Moreover, when questioned as to whether Lero or Santos had been provided information about the Florida accounts, Joseph at first said that *354 the accountants had been given this information, but later admitting that they had not been informed about the Florida accounts nor the personal use of these corporate receipts. Lucy was present at these meetings and never disputed these admissions by her spouse. These further attempts by the O'Briens at concealment of the unreported corporate receipts and the refusal to cooperate fully in the income tax investigation constitute additional evidence of fraud.See United States v. Beacon Brass Co.,344 U.S. 43 (1952); Granat's Estate v. Commissioner,298 F. 2d 397, 398 (2d Cir. 1962), affg. a Memorandum Opinion of this Court.
The heart of Macadam's defense is its claim that any responsibility for the understatements of income is due to the negligence of the accountants, rather than because of fraud on the part of Macadam. It is here that petitioner invokes the principle of Davis v. Commissioner,184 F. 2d 86 (10th Cir. 1950), revg. a Memorandum Opinion of this Court, that *355 "to hold a taxpayer guilty of fraud, who without actual knowledge that a return is false, and after a full disclosure to the expert preparing the same, would be untenable." 184 F. 2d at 88. However, the existence of the factual prerequisite to this argument, i.e. that the accountants were given all the relevant information by the O'Briens necessary to prepare the returns (see Foster v. Commissioner,supra at 732; Bender v. Commissioner,256 F. 2d 771, 774 (7th Cir. 1958), affg. a Memorandum Opinion of this Court) is simply not supported by the record. First, there is the testimony of the two accountants that they were not given the information concerning the Florida accounts. Second, there is the corroborative testimony of the revenue agent that Joseph O'Brien admitted to the concealment of this information from the accountants, and that Lucy acquiesced to this admission. Petitioners attempt to characterize the testimony of Lero as self-serving and unworthy of belief, based upon the alleged negligence of Lero in handling the Macadam account, and on the basis of Lucy's testimony that all the records were made available to the *356 accountants. Based on our evaluation of the entire record, we are convinced that the information about the Florida accounts was never provided to the accountants, and consequently the Davis principle is of no help to petitioners. [6]
Petitioner Macadam also maintains that the personal withdrawals from the Florida accounts should be considered as additional compensation to its officers, deductible by it under section 162(a). The consequence of allowing such deduction would be to substantially decrease the understatement of corporate taxable *357 income for each of the years in issue. The test of the deductibility of alleged compensation is two-pronged. A corporation may deduct as compensation amounts disbursed provided (1) the amounts paid or disbursed do not exceed the reasonable compensation for the services actually rendered, and (2) the amounts are actually intended to be paid purely for the services. Section 1.162-7, Income Tax Regs.SeeElectric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1341 (1971), affd. per curiam 496 F. 2d 876 (5th Cir. 1974). In this case, we must conclude that Macadam has not shown that the amounts withdrawn from the Florida accounts were intended to be paid as compensation. Macadam made no attempt to characterize these amounts as compensation when officers' salaries were determined each year. Rather these amounts were merely ignored, or more precisely concealed, when compensation was determined. The possibility that these withdrawn amounts would have been treated as compensation under Macadam's normal accounting procedures for personal withdrawals *358 absent their concealment does not persuade us that these amounts were intended to be paid as compensation. The O'Briens, in the exercise of their business judgment as the officers and owners of Macadam, each year determined the total amounts to be paid as compensation; such amounts did not include the diverted amounts. We find the cumulative weight of these factors to have established Macadam's fraud by clear and convincing evidence. We therefore conclude that the omissions from income on Macadam's returns for the taxable years 1966 through 1969 were fraudulent. Our decision on the fraud issue also disposes of Macadam's assertion that the statute of limitations bars the assessment and collection of the deficiencies determined herein for the years 1966 and 1967. Section 6501(c)(1). With respect to the O'Briens, we find that respondent has proven that at least a portion of their underpayments of Federal income tax for each of the years 1966 through 1969 was due to fraud. Our conclusion is based upon essentially the same factors as was our conclusion of fraud on the part of Macadam. *359 The unreported income of Joseph and Lucy arose from their failure to include in their gross income amounts they diverted from Macadam and used for personal purposes. The diversion of Macadam funds was accomplished either by personal withdrawals from the corporate checking accounts in Florida, or by merely appropriating corporate receipts without first depositing such receipts in a corporate bank account. The evidence of fraud by the O'Briens is briefly summarized as follows. There were repeated and substantial understatements of income by the O'Briens in an amount totaling $45,405.86 over the years in issue. In addition, the O'Briens' accountants were not advised about the existence of the Florida bank accounts, the numerous withdrawals from these corporate accounts for their personal use, nor that such withdrawn amounts should be accounted for in the same manner as personal withdrawals by the O'Briens from the corporate accounts in New York. The O'Briens also refused to make their personal checking accounts and records available to the return preparers, making discovery of this source of funds by the accountants virtually impossible. In short, the O'Briens were knowledgeable *360 about the assumptions underlying the reliability of the bank deposit method of determining the corporate receipts, and systematically exploited one of the deficiencies of this method to conceal their diversion of the corporate receipts to their own use.This was done fraudulently, and with the intent to evade a tax believed to be owing. Petitioners final contention is that the corporate receipts diverted by the O'Briens to their own use actually constituted advances to them by Macadam as draws against their salaries rather than unreported dividend income. They argue that these amounts should be accorded treatment similar to the personal withdrawals from the Fulton account.We cannot accept such a characterization of these amounts.
In order to constitute advances by Macadam, it must be determined that the O'Briens actually intended to repay the amounts involved, either by the crediting mechanism of the personal withdrawal account or otherwise.Cf. Chism's Estate v. Commissioner,322 F. 2d 956, 960 (9th Cir. 1963), affg. sub nom. Chism Ice Cream Co. v. Commissioner, *361 a Memorandum Opinion of this Court; Clark v. Commissioner,266 F.2d 698, 711 (9th Cir. 1959), affg. in part and revg. in part a Memorandum Opinion of this Court; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1339 (1971), affd. per curiam 496 F.2d 876 (5th Cir. 1974). There is nothing in the record, however, which indicates the O'Briens ever considered themselves obligated to repay these amounts. They failed to recognize such an obligation at the end of each year when they determined their compensation and balanced that amount against their withdrawals for the year, using only those withdrawals from the Fulton account. This was necessary because of the concealment of the Florida accounts from the accountants. They also completely failed to account for the undeposited receipts of Macadam that were diverted, again recognizing no obligation to repay them. Therefore, we will not treat these amounts as loans to the O'Briens, but accept respondent's treatment of the amounts as dividend income. See DiZenzo v. Commissioner,348 F.2d 122 (2d Cir. 1965), affg. in part and revg. in part a Memorandum Opinion of this *362 Court; O'Rourke v. United States,347 F.2d 124, 127 (9th Cir. 1965); see also, Gardner, "The Tax Consequences of Shareholder Diversions in Close Corporations," 21 Tax L. Rev. 223, 226 (1966). To reflect the foregoing, Decisions will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. ↩
2. These cases were consolidated because Joseph H. O'Brien and Lucy V. O'Brien were the sole stockholders in Macadam during the years 1966 through 1969, and the issues in both cases arise from the same facts.↩
*. There was an interbank transfer of $3500 during 1966.↩
*. The 1968 total should be $8,434.21, rather than the amount of $8,454.21, which was stipulated.↩
3. SEC. 6653. FAILURE TO PAY TAX (b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * ↩
4. Petitioners concede in the stipulation that corporate receipts were understated and that corporate funds were converted for the personal use of the individual petitioners. However, the size of the deficiency is in dispute as petitioners argue that the converted funds were salaries rather than dividends, and that some of the funds were expended by the individual petitioners for corporate business expenses.↩
5. The intentional manipulation of the corporate bookkeeping system in order to conceal the true extent of gross receipts is further demonstrated by evidence of corporate receipts in the amount of $9,114.27 which, over these four years, were never deposited to any corporate bank accounts, but were directly diverted to the O'Briens' personal use.↩
6. We note here that even were we to accept petitioners' theory that the Florida bank accounts information had been supplied to the accountants, there is no evidence that the accountants were given any information about the $9,114.27 in receipts that were directly diverted by the O'Briens for their own use. Although these amounts generate only a small portion of the underpayments of tax in each year, we find that such underpayments were due to fraud, and the fraud penalty would nonetheless be applicable to the entire amount of the underpayment. See sec. 6653(b); Arlette Coat Co. v. Commissioner,14 T.C. 751, 756↩ (1950).